277 N.J. Super. 1 (1994)
648 A.2d 1128
PAUL McGEE, PLAINTIFF-RESPONDENT,
v.
CAROL McGEE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 23, 1994.
Decided July 21, 1994.
*2 Before Judges SHEBELL and LONG.
Patricia M. Barbarito argued the cause for appellant (Einhorn, Harris, Ascher & Barbarito, attorneys for appellant; Bonnie C. Frost, on the brief).
*3 Peter J. Laemers argued the cause for respondent (Morris, Downing & Sherred, attorneys; Cynthia L. Gehring and Mr. Laemers, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
Defendant Carol McGee challenges certain aspects of the final judgment of divorce which dissolved her marriage to plaintiff, Paul McGee. On appeal, Mrs. McGee argues that the trial judge erred in his award of equitable distribution by failing to consider the premarital history of the parties; improperly awarded her "rehabilitative alimony" when permanent alimony was warranted; and neglected to apply the proper standards to her motion for counsel fees. Upon careful analysis of this record in light of these contentions, we reverse.

I
The parties began their relationship in June 1981. At that time both had been divorced, Dr. McGee once and Mrs. McGee twice. When they began seeing each other, Dr. McGee had been living in an apartment. Mrs. McGee was living in the house she received by way of equitable distribution from her second divorce. She had designed the house and supervised its construction in 1973. The house and pool were situated on two acres; there was an adjoining lot of almost eleven acres.
Mrs. McGee was in default on the mortgage on the house while she was going through her divorce from her second husband, although she was paying the utilities. The house, acreage and animals, including five horses she had had for twenty-four years at the time of trial, were extremely important to Mrs. McGee who, according to Dr. McGee repeated this fact at least "500 times in nine years." In 1982, due to Mrs. McGee's mortgage, tax and insurance defaults (she owed $62,955.54), the bank proceeded to foreclosure and ultimately obtained final judgment. In April 1982, shortly prior to the sheriff's sale, Dr. McGee purchased the *4 property from Mrs. McGee as a result of his relationship with her. He paid the bank for the mortgage and all other debts associated with the house. He obtained a mortgage on the house to do this, borrowing at least $10,000 in excess of what was required, so he could use the money for his own "purposes."
According to Dr. McGee's testimony at trial, he bought the house because he heard a "constant harangue" from Mrs. McGee about her fear of losing the house.
She was terrified of losing the house and so on and so forth and she really had no recourse other than me. I said to her, "if you want me to help you with that house, I will insist on two things: I want the house in my name and the two acres and the separate lot also in my name." I said "otherwise, I am not going to help you."
Dr. McGee testified that he did not know the precise value of the house and the adjoining unencumbered eleven acres at the time he purchased them. Mrs. McGee was not represented by an attorney in this transaction which, as Dr. McGee recognized, she entered into when she was under financial strain. In 1981, the value of the house located on the two acres was estimated by Dr. McGee to be approximately $150,000. The value of the eleven acres at that time is unknown. The house was fully furnished when Dr. McGee took title to it.
In February 1983, Dr. McGee moved in with Mrs. McGee. They became engaged in 1983 and cohabited in the house (with a separation in 1984) until 1991. They were married in 1989.
From 1981 onward, Dr. McGee supported Mrs. McGee financially. They lived comfortably and functioned as if they were husband and wife. Dr. McGee supplied credit cards for Mrs. McGee's use. He paid all of the household bills and gave her $300 a week. For her part, she functioned as a wife. She undertook all of the household domestic responsibilities; cooked dinner; ran errands; did the cleaning and the laundry; cared for the horses and shopped for food and clothing for herself and Dr. McGee. In short, they engaged in a traditional marital partnership long before the formalities of marriage took place. Mrs. McGee testified that people assumed they were married and that they actually held themselves out as a married couple during the long period of *5 premarital cohabitation. Nancy Roessel, a neighbor who was maid of honor at the couple's wedding, stated that the parties "did everything together" and that they appeared to be husband and wife prior to their actual marriage. Dr. McGee admitted that they occasionally held themselves out as husband and wife.
In 1984, the parties decided to improve the house and began extensive renovations. Mrs. McGee left her employment with Dr. McGee's approval to oversee the improvements on the house because "she had a lot of knowledge in construction." She did not return to work.
Dr. McGee is now fifty-one years old and a medical doctor in private practice, licensed since 1972. Throughout his relationship with Mrs. McGee, he continued to work at his practice and doubled his income between 1982 and 1991. In 1982 he had gross earnings of between $100,000 and $120,000. In 1987, he grossed $152,700 from his practice. In 1988, he sold a limited partnership for which he received $26,492, and had gross earnings of $182,298. In 1989, he earned $200,688 and he sold another limited partnership for $34,305. In 1990, he earned $190,011; in 1991, $230,162 and in 1992, $216,000. Neither Dr. nor Mrs. McGee obtained an appraisal of the medical practice, nor was any expert called by her to indicate to the court the value of the practice. Dr. McGee's Keogh plan, which had a value of approximately $180,000 at the time of trial, was not acquired during the marriage and no contributions were made by him to the plan during the parties' relationship.
Mrs. McGee is a fifty-seven year old woman with minor medical problems (a thyroid condition). She does not have any post-secondary education. In 1981, she worked for a small publishing company in Fredon and, thereafter, had sporadic employment. She ran a magazine delivery service; worked for an attorney in New York for a year or less and was also placed as a secretary at AT & T by a temporary agency for one year. For some time, in 1983 and 1984, she worked in Dr. McGee's medical office as a receptionist on Wednesday evenings and Saturdays. In 1983, she *6 earned $1175 from Dr. McGee and $14,359 from Lakeland Temporary Services. Mrs. McGee did not return to work thereafter. She testified that, since her separation from Dr. McGee, she has signed up with two temporary agencies and that she has been tested for employment. Mrs. McGee has no computer skills. She believes that her lack of skills and her age are impediments to her self-sufficiency.
At trial a significant amount of testimony was adduced on Mrs. McGee's charge that Dr. McGee was guilty of committing several assaults against her as a result of which she alleged post-traumatic stress syndrome. The judge rejected this claim and no appeal has been taken from the adverse judgment. Thus, the facts surrounding the matter have been omitted from this opinion.
Throughout his relationship with Mrs. McGee, Dr. McGee lived up to his significant financial obligations from his prior marriage. Dr. McGee paid alimony to his first wife from 1982 to 1987. In 1982, alimony was set at $450 a week. The divorce permitted cost of living increases so that he was paying $650 a week for the last year of alimony payments. Therefore, his annual alimony ranged from $23,400 to $33,800 by the time his obligation to his first wife ended in April 1987. In 1982, child support for Dr. McGee's two children was set at $100 per week per child. Because of cost of living allowances, Dr. McGee was paying $130 per child per week by May 1987 and $165 per week per child at the time of trial when both children were at home.[1]
These figures mean that Dr. McGee paid total support of $33,800 from May 1982 through April 1983 and at least $44,200 from May 1986 through April 1987. Although we do not know what the exact payments were in the intervening years, a conservative *7 calculation of four years at $33,800 plus one year at $44,200 adds up to $179,400.
Child support payments from 1987 to 1991 were at least $130 per child per week. This adds up to $54,080 over four years. Additionally, both children attended summer camp at a cost of $300 per child per week. Dr. McGee's daughter attended for a total of five years. She spent four weeks at camp for the first three years and eight weeks at camp for the next two years. His son spent four weeks at camp for each of two summers. The total cost for summer camp was $10,800, a sum which Dr. McGee paid alone. Dr. McGee also paid $14,000 to send his daughter to Blair Academy for one year, 1989-90. Furthermore, he paid $4400 for both children's orthodonture. Dr. McGee's support of his children and former spouse cost at least $262,680 from 1982 to 1991, not including what he paid for their unreimbursed medical and dental bills.
In 1985, Dr. McGee refinanced the marital home and took out $26,000 in cash from the equity. In 1987, he took out a home equity line for $98,000. According to Dr. McGee's testimony, both sums were for "general operating" costs. Additionally, Dr. McGee testified that when he purchased the home at the sheriff's sale in 1982, he took out $10,000 in equity for his own purposes. Dr. McGee's actions denuded the house of $134,000 of equity. Importantly, while Dr. McGee testified that he had made over $100,000 worth of improvements over the years, the checks entered into evidence to support Dr. McGee's claims only total about $32,000.
Thereafter, he reconveyed the marital home and adjoining lots back to himself and Mrs. McGee. This occurred prior to their marriage. During the course of their cohabitation, Mrs. McGee's furniture was gradually replaced by the parties.
The trial judge granted the parties a divorce and ordered the marital home sold. He stated:
I must order that the real estate be sold, not separately, but together. The plaintiff has requested that he be given the right to be a buyer. His buying price for the defendant's equitable distribution  which I find should be on a 50/50 basis *8 by the way.... I find that the proposal of the plaintiff to buy out the interest of the defendant in the lot and residence is a fair one.
The methodology employed by the judge for the buyout was as follows:
The property is appraised at $234,000. There's $175,000 in mortgages. The equity is reduced by what would be a real estate broker's commission, a realty transfer fee, etc., which makes the sum of $25,000 in effect more than half of the net equity that the defendant would realize if there were a sale. This sale must be competent  this sale to the plaintiff must be accomplished in the following way or that  the property will be immediately listed with a broker. And that is as follows. [W]ithin 7 days of today's date, the plaintiff will pay to the defendant the sum of $5,000. Within 7 days of today's date, the defendant will execute a deed for her interest in the property to the plaintiff. The deed will be held by Mr. Laemers in escrow. The $20,000 balance owed to the defendant will also be held by Mr. Laemers in his trust account and it is to be deposited there within 7 days of today's date, if that is doable. Because I realize it's got to be withdrawn from a Keogh Plan. But I want it, if possible, within 7 days. The defendant needs time to find new housing, to relocate her animals and get herself organized for her future. And so, she shall have 60 days from today's date to vacate the premises. During that 60 day period, the plaintiff will maintain the status quo with regard to all payments being made regarding the pendente lite order. All payments. At the close of 60 days, the defendant is to receive the sum of $20,000 from Mr. Laemers' trust account and Mr. Laemers can, at that time, record the deed to the plaintiff for the property. Regarding the animals, I find the suggestion of the plaintiff to be a good one. The animals, the horses shall remain in the barn and they may remain there until September 30, 1993, at which time they are to be moved.
The judge further ordered six months of rehabilitative alimony at $750 per month. He stated:
Regarding alimony. The defendant claims that this is a permanent alimony case. The plaintiff claims that it is not an alimony case at all. The court finds that this is a case which requires rehabilitative alimony. There is little question in my mind, but that the defendant is healthy and capable of going into the work place. While her doctors testified, and I use the term plurally, no one testified that she's not able to work. No one testified that she needs treatment. No one testified that she needs a medical regime of any sort. She has had 2 years, at approximately $60,000 a year while the parties are separated, to find herself employment, she has chosen not to so do. Nonetheless, I think that she's entitled to rehabilitative alimony, so that she can have an opportunity to get on her feet, get the career training she needs and get organized for the rest of her life. And so, there will be rehabilitative alimony in the amount of $750 a month. It'll begin with the month of June 1993 and conclude with the month of December 1993.
He also ordered Dr. McGee to continue to maintain health insurance for Mrs. McGee through June 30, 1994. The judge further determined that the federal and state tax liability which *9 had accrued during the marriage was a marital debt. He ordered that the Dr. McGee alone satisfy said obligations and, further, ordered that Mrs. McGee have no responsibility with respect to the tax liabilities. Dr. McGee was ordered to pay credit card debts as well.
The judge determined that the Keogh plan was acquired prior to the marriage and that it was not subject to equitable distribution. Likewise, the medical practice was found not to be subject to equitable distribution. He awarded a 1987 Grand Marquis to Mrs. McGee and several other cars to Dr. McGee. Mrs. McGee was permitted to remove from the thirteen rooms of furniture in the marital home her bedroom set, a living room set, the kitchen furniture, and all utensils, including pots, pans and dishes located in the kitchen. All other personalty remained the property of Dr. McGee. The judge found that Dr. McGee's mortgaging of the marital residence was not a dissipation of assets because "none of that occurred during marriage" and because it was done "appropriately."
He did not award attorney's fees to Mrs. McGee for the following reasons:
Finally with regard to counsel fees. The plaintiff is quick to point out that he's paid $7,500 towards counsel fees, $2,500 toward expert fees and $750 additional for expert testimony. I find that based upon the payments made to date, there will be no award to the defendant of counsel fees beyond that already paid. I think that under the circumstances  the plaintiff has paid a fair amount toward the counsel fees. In closing, the Court has laid a great deal of emphasis on the credibility of the parties, as he's assessed their testimony. In addition, I've taken into consideration and placed heavy weight upon the fact that there has been an extremely high pendente lite order in this case. Based upon the kind of debt that the plaintiff has faced over the years, both marital debt, debt from his obligations to his first marriage and debt as a result of perhaps his own doing, nonetheless, he has paid and maintained the status quo to the tune of approximately $60,000 per year. I find that's sufficient and that has been  I have credited to him those sums when I made determinations about permanent alimony, rehabilitative alimony, equitable distribution and the like.
Due to emergent applications to this court and the Supreme Court, Mrs. McGee is currently receiving $2000 a month alimony and the sale of the marital residence has been stayed. She has *10 been ordered out of the residence; it is not known where the horses are.

II

EQUITABLE DISTRIBUTION
Although at first blush the trial judge's opinion seems thorough enough, a close analysis of it leads to the conclusion that several critical matters were either misconceived or overlooked. As a result, a sense that an unjust outcome has been reached pervades this case.
Despite the judge's contentions to the contrary, we see no evidence in this record that he considered the statutory criteria in distributing what was effectively the sole valuable marital asset, the marital residence and adjoining eleven acres. New Jersey law requires that:
In making an equitable distribution of property, the court shall consider, but not be limited to, the following factors:
a. The duration of the marriage;
b. The age and physical and emotional health of the parties;
c. The income or property brought to the marriage by each party;
d. The standard of living established during the marriage;
e. Any written agreement made by the parties before or during the marriage concerning an arrangement of property distribution;
f. The economic circumstances of each party at the time the division of property becomes effective;
g. The income and earning capacity of each party, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children, and the time and expense necessary to acquire sufficient education or training to enable the party to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage;
h. the contribution by each party to the education, training or earning power of the other;
i. The contribution of each party to the acquisition, dissipation, preservation, depreciation or appreciation in the amount or value of the marital property, as well as the contribution of a party as a homemaker;
j. The tax consequences of the proposed distribution to each party;
k. The present value of the property;

*11 l. The need of a parent who has physical custody of a child to own or occupy the marital residence and to use or own the household effects;
m. The debts and liabilities of the parties;
n. The need for creation, now or in the future, of a trust fund to secure reasonably foreseeable medical or educational costs for a spouse or children; and
o. Any other factors which the court may deem relevant.
In every case, the court shall make specific findings of fact on the evidence relative to all issues pertaining to asset eligibility or ineligibility, asset valuation, and equitable distribution, including specifically, but not limited to, the factors set forth in this section.
It shall be a rebuttable presumption that each party made a substantial financial or nonfinancial contribution to the acquisition of income and property while the party was married.
[N.J.S.A. 2A:34-23.1.]
Several of these standards were not considered by the trial judge. Significant omissions include: that this was a ten year relationship; that the living standard was comfortable; that Mrs. McGee was the original owner of the home and had lived there for twenty years; that she designed it and supervised its construction and loved it; that when Dr. McGee agreed to take over the house and save it from the sheriff's sale, Mrs. McGee immediately lost at least $87,000[2] in equity and Dr. McGee received a windfall in that amount when the house was transferred to him; that Dr. McGee systematically bled the house of value prior to marrying Mrs. McGee so that practically no equity was left when the house was deeded back to both of them, and that from 1982 onward, Dr. McGee paid over a quarter of a million dollars to support his previous wife and two children which funds were apparently part of the "general operating" costs of himself and Mrs. McGee. In addition, during the years of his relationship with Mrs. McGee, while Dr. McGee's annual income doubled, she labored at home on their behalf. She is now fifty-seven, unskilled, unemployed and very likely unemployable.
*12 The trial judge does not appear to have given consideration to any of these matters in simply valuing the house as of the time of the distribution and in allowing Dr. McGee to buy Mrs. McGee out of her house for $25,000. It is inexplicable to us that $25,000 is the sum of her distribution after a ten year partnership in which she labored in the role of a wife de facto and de jure and into which she brought a house with $87,000 worth of equity and eleven unencumbered, undeveloped acres.
Moreover, while the judge may have been correct in his conclusion that Dr. McGee did not "dissipate" assets, he appears to have given no consideration at all to the payment of a small fortune by Dr. McGee toward his pre-existing obligations to his former wife and children. Mrs. McGee was not required to contribute her assets toward that support and this is an equitable consideration applicable to distribution.
While technically the house was denuded of its value prior to the ceremonial marriage between the McGees, contrary to the judge's conclusions, this does not end the inquiry. It is the complete factual scenario surrounding the parties' lengthy relationship which should have been considered here and was not. The case can be viewed from the vantage point of the shared enterprise of marriage beginning before the ceremonial act, see Berrie v. Berrie, 252 N.J. Super. 635, 600 A.2d 512 (App.Div. 1991); Weiss v. Weiss, 226 N.J. Super. 281, 543 A.2d 1062 (App.Div.), certif. denied, 114 N.J. 287, 554 A.2d 844 (1988) or as one in which equitable remedies such as constructive trust, quasi contract or quantum meruit are invocable for equitable reasons. Carr v. Carr, 120 N.J. 336, 576 A.2d 872 (1990). It is clear to us that the trial judge considered none of this.
We thus reverse and remand the case to him for a full reconsideration of equitable distribution based on the statutory criteria and the issues to which we have adverted. While on remand, several other equitable distribution errors can be corrected. The realtor's fee and transfer tax should not have been subtracted from the value of the property because it was not being sold to a *13 third party. Wadlow v. Wadlow, 200 N.J. Super. 372, 383, 491 A.2d 757 (App.Div. 1985). With respect to personalty, Mrs. McGee came into the relationship with a houseful of furniture. As it aged, much of it was replaced during the cohabitation but prior to the marriage. Absent specific testimony to support an unequal division, there is no justification for anything other than a fifty-fifty split of all thirteen rooms of household furnishings. This should be done on remand.

III

ALIMONY
Under N.J.S.A. 2A:34-23(b), the trial judge was required to consider, among others, the following factors in determining an award of permanent or rehabilitative alimony:
(1) The actual need and ability of the parties to pay;
(2) The duration of the marriage;
(3) The age, physical and emotional health of the parties;
(4) The standard of living established in the marriage and the likelihood that each party can maintain a reasonably comparable standard of living;
(5) The earning capacities, educational levels, vocational skills, and employability of the parties;
(6) The length of absence from the job market and custodial responsibilities for children of the party seeking maintenance;
(7) The time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, the availability of the training and employment, and the opportunity for future acquisitions of capital assets and income;
(8) The history of the financial or nonfinancial contributions to the marriage by each party including contributions to the care and education of the children and interruption of personal careers or educational opportunities;
(9) The equitable distribution of property ordered and any payouts on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair; and
(10) Any other factors which the court may deem relevant.
* * * * * * * *
In any case in which there is a request for an award of rehabilitative or permanent alimony, the court shall consider and make specific findings on the evidence about the above factors.
[N.J.S.A. 2A:34-23(b).]
*14 In Lepis v. Lepis, 83 N.J. 139, 155, 416 A.2d 45 (1980), the Supreme Court introduced the concept of "rehabilitative alimony." This permitted a short-term award "from one party in a divorce [to] enable [the] former spouse to complete the preparation necessary for economic self-sufficiency." Hill v. Hill, 91 N.J. 506, 509, 453 A.2d 537 (1982). "`[R]ehabilitative' alimony is alimony payable for a terminable period of time when it is reasonably anticipated that a spouse will no longer need support." Dotsko v. Dotsko, 244 N.J. Super. 668, 677, 583 A.2d 395 (App.Div. 1990).
It is unclear to us what purpose is served by the "rehabilitative" alimony award in this case. The judge made no findings that would indicate that seven months of $750 payments would do anything to provide Mrs. McGee with employment skills or otherwise make her economically self-sufficient. Despite the judge's finding that Mrs. McGee is "healthy and capable of going into the work place," she is not trained to do anything in today's work world. Thus, no foundation appears from the record for a limited rehabilitative alimony award nor is it clear to us whether the need for permanent alimony was fully explored.
While it is true that this was not a lengthy marriage,
"[t]he extent of actual economic dependency, not one's status as a wife [or husband] must determine the duration of support as well as its amount." Courts must consider the duration of the marriage in awarding alimony, N.J.S.A. 2A:34-23. However, the length of the marriage and the proper amount or duration of alimony do not correlate in any mathematical formula. Where the circumstances of the parties diverge greatly at the end of a relatively short marriage, the more fortunate spouse may fairly be called upon to accept responsibility for the other's misfortune  the fate of their shared enterprise.
[Lynn v. Lynn, 91 N.J. 510, 517-18, 453 A.2d 539 (1982).]
Here, Mrs. McGee lived with Dr. McGee long before the marriage and gave up her job, if not because Dr. McGee asked her to do so, at least because he was willing to support her. She became financially dependent on him as early as 1981. Mrs. McGee made many non-financial contributions to the relationship during which, while she labored at home, Dr. McGee doubled his income. While she is not disabled, she is at a distinct disadvantage as to *15 employability, especially at a level which would allow her to replicate the lifestyle she and Dr. McGee shared on his $200,000 plus income along with the equity he bled out of her house. Indeed, it is not clear to us that she is capable of "rehabilitation" at all.
In view of the trial judge's findings and the purpose of rehabilitative alimony, as well as the fact that the judge did not address the long period of cohabitation in his opinion, we remand the case to him for a full consideration of the issues of rehabilitative and permanent alimony upon application of the proper standard. A full explication of his reasoning should be set forth.

IV

COUNSEL FEES
Judges are empowered with discretion to award counsel fees.
The court may order one party to pay a retainer on behalf of the other for expert and legal services when the respective financial circumstances of the parties make the award reasonable and just. In considering an application, the court shall review the financial capacity of each party to conduct the litigation and the criteria for award of counsel fees that are then pertinent as set forth by court rule. Whenever any other application is made to a court which includes an application for pendente lite or final award of counsel fees, the court shall determine the appropriate award for counsel fees, if any, at the same time that a decision is rendered on the other issue then before the court and shall consider the factors set forth in the court rule on counsel fees, the financial circumstances of the parties, and the good or bad faith of either party.

[N.J.S.A. 2A:34-23 (emphasis added).]
In Williams v. Williams, 59 N.J. 229, 281 A.2d 273 (1971), the Supreme Court set forth factors which should be considered in deciding counsel fees. These are: the applicant's need, the spouse's financial ability to pay, and the applicant's good faith in instituting or defending the action. Id. at 233, 281 A.2d 273. See also, Guglielmo v. Guglielmo, 253 N.J. Super. 531, 545, 602 A.2d 741 (App.Div. 1992). This analysis was not undertaken by the trial judge. Other than his expression of the fact that he apparently thought Dr. McGee had paid "enough" counsel fees, no rationale *16 for his determination was set forth. We thus reverse the denial of the award of counsel fees and direct that the trial judge make appropriate findings and conclusions on this issue after applying the established standards.
In sum, the trial judge should give this matter full reconsideration, taking into account this record and such other proceedings, summary or plenary, that he may order to take place.
Reversed and remanded. Jurisdiction is not retained.
NOTES
[1] It appears from the transcript that Dr. McGee's son entered college after Dr. McGee's separation from Mrs. McGee. When his son is in college, he pays only $82.50 per week for his support and contributes eighty percent of his college expenses. However, these figures do not enter into our analysis because, for equitable distribution purposes, the marriage ended in 1991 when the complaint was filed.
[2] We say "at least" because we only know that Dr. McGee purchased a house he believed to be worth $150,000 for $63,000. The adjoining eleven acres were not valued. Dr. McGee received them for free.