45 A.3d 1001 (2012)
426 N.J. Super. 475
J.E.V., Plaintiff-Respondent,
v.
K.V., Defendant-Appellant.
A-2933-09T2
Superior Court of New Jersey, Appellate Division.
Argued January 25, 2012.
Decided June 21, 2012.
*1004 John A. Hartmann, III, Princeton, argued the cause for appellant (Pellettieri, Rabstein & Altman, attorneys; Mr. Hartmann, of counsel; Nicole J. Huckerby, Trenton, on the brief).
Barbara Ulrichsen argued the cause for respondent (Ulrichsen, Rosen & Freed LLC, attorneys; Ms. Ulrichsen, of counsel and on the brief; Rebecca C. Day, Pennington, on the brief).
Before Judges CUFF, LIHOTZ and WAUGH.
The opinion of the court was delivered by CUFF, P.J.A.D.
In this appeal, the dependent spouse argues that the trial judge erred by awarding limited duration alimony rather than permanent alimony. We reaffirm established principles governing the award of limited duration alimony, which consider the length of the marriage, the period of economic dependency during the marriage, and the skills and education necessary to return to the workforce rather than an overriding emphasis on the marital lifestyle and the ability to replicate the marital lifestyle at the end of the chosen term. Applying these principles and the well-supported finding that the mental health problems affecting the supported spouse will not interfere with her ability to obtain and sustain employment, we affirm a ten-year period of limited duration alimony.
The parties were married on March 17, 1996. Their marriage endured for over nine years. They have two children. Their oldest daughter was born in May 1998; their youngest daughter in May 2001. One child attends public school; the other attends a local private school.
At the time of trial, plaintiff J.E.V. was forty-four years old and defendant K.V. was thirty-seven years old. They first met in 1994 when plaintiff was a dermatology resident at medical school in Texas. At that time, defendant was a recent college graduate with a degree in recreation and tourism.
After graduation, defendant earned approximately $28,000 a year as a sales representative for a national payroll service. The couple lived together for one year, married, and then moved to California so plaintiff could participate in a one-year fellowship. Defendant continued to work for the same firm in California earning up to $65,000 annually.
Plaintiff accepted a position as director of surgical service at a major hospital in central New Jersey, where the couple relocated. Defendant continued to work for the same firm in New Jersey, but left the firm because of the breadth of the territory assigned to her. She took a position as a pharmaceutical sales representative, separating from employment when she became pregnant.
Plaintiff opened his own dermatology practice in central New Jersey in July 2001. He focused on a sophisticated surgical procedure used to remove skin cancer. Defendant became involved in numerous charitable and fundraising events and sought to promote her husband's practice. She also performed market and demographic research geared toward the opening of the practice. When the practice *1005 opened, she worked as office manager and administrator.
Plaintiff testified that defendant was initially in charge of the finances, submitting all billing forms to the billing service, hiring, firing, and public relations. After about six months, plaintiff and defendant hired an office manager and defendant became the overseer of the office manager and remained in charge of most of the financial aspects of the practice until the parties separated. Plaintiff claimed defendant worked on billing about one hour per night and worked about twenty hours per week in total for the practice.
Following the birth of their oldest daughter in May 1998, the parties hired a full-time nurse and then a full-time nanny to care for the child. They purchased a house close to plaintiff's office in March 1999. When their second child was born in May 2001, the parties hired a second full-time nanny, who was also a housekeeper, and also a part-time weekend nanny.
Defendant has a history of mental and emotional problems. Starting in 2002, she began to experience a great deal of anxiety. She began seeing a psychiatrist in early 2003. He diagnosed her with mania and anxiety and prescribed three medications to help manage her condition. Defendant changed doctors in early 2004. Her new psychologist and members of his practice altered defendant's medications. Starting in Fall 2005, defendant was hospitalized three times.
Defendant's treating psychiatrist diagnosed her with bipolar disorder. She also had symptoms of borderline personality disorder. Defendant testified that the side effects from her medications could produce dry mouth, a lisp, dry eyes, dizziness, gastro-intestinal upsets, weight gain, irritability, and suicidal thoughts. She stated that when she experienced unpleasant side effects, she stopped taking her medication, then conferred with her treating doctor to adjust the medications. Plaintiff did not dispute defendant's struggles with bipolar disorder and her course of treatment.
Defendant's psychiatrist testified that she might be able to get a job but expressed reservations about her ability to retain a job. Her biggest problem in maintaining a job was her mood swings that were related to the level of stress she experienced. He concluded that within a reasonable degree of medical certainty it was questionable whether she would be able to sustain gainful employment at that time. He further opined that the key to her ability to sustain employment in the future was an appreciable change in her emotional status.
The psychiatrist also testified that eighty to eighty-five percent of the patients he treated with bipolar disorder worked. He explained that defendant experienced both depressive and manic episodes. He testified that defendant sometimes stopped taking her medication or changed it herself, which was not unusual in bipolar patients. Defendant also refused to take Depakote and Lithium, the medications of choice for bipolar patients, because they made her gain weight.
Defendant's vocational expert reported that defendant had difficulty focusing and was deeply troubled by the test-taking portion of an employability analysis she asked defendant to perform. She found defendant's "fragility supersede[d] any ability to quantify an earning capacity for her." She also concluded that defendant was unemployable and was unable to work. By contrast, plaintiff's employability expert testified that defendant's past employment history and her demonstrated success in those positions permitted her to obtain employment as a sales representative, secretary, or general office clerk. He *1006 described her as "neat, very well-dressed, very pleasant, outgoing, personable during the interview" and her presentation influenced his opinion because "appearance ... can certainly have an impact on a potential employer." He also testified that defendant informed him of her health concerns but she did not provide a physician's opinion to verify her self report. He noted, however, defendant demonstrated to him that she was not interested in employment. He concluded she was capable of reentering the job market and earning $45,000 to $55,000 per annum.
Judge Jacobson awarded defendant limited duration alimony of $25,527 per month for the first two years and $23,403 per month for the next eight years. She ordered alimony to cease in August 2019, when the youngest child turns eighteen and presumably enters college.
In setting the type, term, and amount of alimony, Judge Jacobson considered the thirteen alimony factors set forth in N.J.S.A. 2A:34-23(b). The judge found permanent alimony was not warranted in light of the intermediate term of the marriage, defendant's age, her failure to prove a permanent disability, her ability to earn income in the future, and her success in past employment endeavors. The judge found that defendant could earn approximately $35,000 annually and would also have unearned income from the cash portion of her equitable distribution award. She also found that defendant had not deferred any career goals.
The amount of the award was based on defendant's budget. The judge included in this amount a monthly savings allocation of $2300, the $2982 monthly mortgage payment, and an income tax reserve. She also recognized that defendant will receive $10,000 monthly in child support and plaintiff will assume all educational, extra-curricular, camp and medical costs.
Defendant also received an equitable distribution award approximating $650,000. Finally, the judge also awarded defendant counsel fees, expert fees, and costs approximating one-third of the obligations she incurred.

I
Defendant does not contest the amount of the alimony award. Emphasizing her mental health problems, she claims that the judge erred in failing to award permanent alimony. In addition, she seeks a credit for the underpayment of her pendente lite tax reserve, and an increase in the counsel and expert fee award.
Limited duration alimony is expressly permitted by statute. N.J.S.A. 2A:34-23(c) provides:
In any case in which there is a request for an award of permanent alimony, the court shall consider and make specific findings on the evidence about the above factors [set forth in N.J.S.A. 2A:34-23(b)]. If the court determines that an award of permanent alimony is not warranted, the court shall make specific findings on the evidence setting out the reasons therefor. The court shall then consider whether alimony is appropriate for any or all of the following: (1) limited duration; (2) rehabilitative; (3) reimbursement. In so doing, the court shall consider and make specific findings on the evidence about factors set forth above. The court shall not award limited duration alimony as a substitute for permanent alimony in those cases where permanent alimony would otherwise be awarded.
. . . .
In determining the length of the term, the court shall consider the length of time it would reasonably take for the recipient to improve his or her earning *1007 capacity to a level where limited duration alimony is no longer appropriate.
According to N.J.S.A. 2A:34-23(f), nothing in the statute "shall be construed to limit the court's authority to award permanent alimony, limited duration alimony, rehabilitative alimony or reimbursement alimony, separately or in any combination, as warranted by the circumstances of the parties and the nature of the case."
A trial court's findings regarding alimony should not be vacated unless the court clearly abused its discretion, failed to consider all of the controlling legal principles, made mistaken findings, or reached a conclusion that could not reasonably have been reached on sufficient credible evidence present in the record after considering the proofs as a whole. Heinl v. Heinl, 287 N.J.Super. 337, 345, 671 A.2d 147 (App.Div.1996). Substantial weight should be given to the judge's observations of the parties' demeanor and credibility. Ibid.
It is well settled that a court dealing with an economically dependent spouse should consider the dependent spouse's needs, his or her ability to contribute to the fulfillment of those needs, and the supporting spouse's ability to maintain the dependent spouse at the former standard of living. Crews v. Crews, 164 N.J. 11, 24, 751 A.2d 524 (2000); Miller v. Miller, 160 N.J. 408, 420, 734 A.2d 752 (1999); Cox v. Cox, 335 N.J.Super. 465, 473-74, 762 A.2d 1040 (App.Div.2000). The goal of alimony is to assist the supported spouse in achieving a lifestyle "reasonably comparable" to the one enjoyed during the marriage. Steneken v. Steneken, 183 N.J. 290, 298-99, 873 A.2d 501 (2005); Crews, supra, 164 N.J. at 17, 751 A.2d 524; Cox, supra, 335 N.J.Super. at 473, 762 A.2d 1040.
In Cox, supra, this court extensively discussed the legislative amendment that added limited duration alimony as an option. We highlighted a passage from the initial sponsors' statement to a Senate Committee Substitute to the proposed legislation explaining the purpose of the amendment:
"This bill would establish limited duration alimony as a third type of alimony, to be used in those cases involving shorter-term marriages where permanent or rehabilitative alimony would be inappropriate or inapplicable but where, nonetheless, economic assistance for a limited period of time would be just."
[335 N.J.Super. at 477, 762 A.2d 1040 (quoting S. No. 54, at 6-7, 208th Leg. (N.J.1998) (statement of Sens. Kavanaugh & Martin) (internal citations omitted)).]
Limited duration alimony is thus awarded in recognition of a dependent spouse's contributions to a relatively short-term marriage that demonstrated attributes of a "marital partnership." Id. at 483, 762 A.2d 1040. Both limited duration and permanent alimony reflect the policy that marriage is an economic and social partnership and that the financial and non-financial contributions of both spouses should be recognized. Id. at 479, 762 A.2d 1040. "All other statutory factors being in equipoise, the duration of the marriage marks the defining distinction between whether permanent or limited duration alimony is warranted and awarded." Id. at 483, 762 A.2d 1040.
In recognizing the need for limited duration alimony, the Commission to Study the Law of Divorce focused "`upon the economic impact of the marriage on the parties by examining whether employment opportunities were lost or career opportunities delayed.'" Id. at 481, 762 A.2d 1040 (quoting Report of the Commission to Study the Law of Divorce, Recommendation 13 at 46-47 (April 18, 1995)). It was *1008 contemplated that a court would determine whether
"any economic dependency that might exist between the parties was created by the marriage or was the product of the parties' disparate skills and educational opportunities, unrelated to anything that happened during the marriage. The court's inquiry would focus not on the fact that the parties were married but upon the impact of the marriage on the parties ... [and on] whether either of the parties were economically disadvantaged by child-rearing responsibilities for children of the marriage."
[Ibid. (quoting Report of the Commission, supra, Recommendation 13 at 46-47).]
The Divorce Study Commission (the Commission) found that limited duration alimony was not intended to be a replacement for permanent alimony "`where the length of the marriage and the contributions made by the dependent spouse are significant. In particular, it is singularly inappropriate in long marriages.'" Id. at 482, 762 A.2d 1040 (quoting Report of the Commission, supra, Recommendation 13 at 47 (footnote omitted)). The Commission was of the "unequivocal view" that limited duration alimony "should be limited to shorter marriages and not be ordered in long-term marriages." Ibid.
In Gordon v. Rozenwald, 380 N.J.Super. 55, 61, 880 A.2d 1157 (App.Div.2005), this court had the opportunity to consider the purpose of limited duration or term alimony in the context of a motion to modify the term alimony provision of a negotiated matrimonial agreement.[1] The parties had been married fifteen years at the time of the final separation and had two children. Id. at 61-62, 880 A.2d 1157. At the time of divorce, the agreement negotiated by the parties contained a fifteen-year term alimony provision. Id. at 62, 880 A.2d 1157. During the marriage, the husband was financially successful and the wife did not work. Id. at 61-62, 880 A.2d 1157. Following dissolution of the marriage, the husband's earnings soared. Id. at 63, 880 A.2d 1157. Although the wife worked, the earnings of the parties were grossly disparate. Ibid.
We observed that "[l]imited duration alimony is available to a dependent spouse who made `contributions to a relatively short-term marriage that ... demonstrated the attributes of a marital partnership' and has the skills and education necessary to return to the workforce." Id. at 65-66, 880 A.2d 1157 (quoting Cox, supra, 335 N.J.Super. at 483, 762 A.2d 1040) (internal quotation marks omitted). We noted that such a spouse is not entitled to permanent alimony because the commitment to the marital enterprise was not sustained and the period of economic dependency was not prolonged. Id. at 66, 880 A.2d 1157. We also commented that
[t]he premise for a term of limited duration alimony under N.J.S.A. 2A:34-23c is primarily historical not predictive and it is not based upon estimates about financial circumstances at the time of termination. Thus, the end date of a term of limited duration alimony is the equivalent of an arrangement to terminate support at a predetermined time or event, regardless of need.
[Id. at 68, 880 A.2d 1157.]
In Cox, supra, we held that limited duration alimony was not appropriate following a twenty-two year marriage. 335 N.J.Super. at 469-70, 762 A.2d 1040. *1009 There, the wife was employed during the marriage and eventually enrolled in law school, passed the bar, and obtained a position as an associate in a law firm. Id. at 470, 762 A.2d 1040. The husband earned substantially more than his wife throughout the marriage. Ibid.
In the course of the opinion, we sought to distinguish the four forms of alimony authorized by the Legislature: permanent alimony, limited duration alimony, reimbursement alimony, and rehabilitative alimony. Id. at 474-76, 762 A.2d 1040. As to limited duration alimony, we said:
Limited duration alimony is not intended to facilitate the earning capacity of a dependent spouse or to make a sacrificing spouse whole, but rather to address those circumstances where an economic need for alimony is established, but the marriage was of short-term duration such that permanent alimony is not appropriate. Those circumstances stand in sharp contrast to marriages of long duration where economic need is also demonstrated. In the former instance, limited duration alimony provides an equitable and proper remedy. In the latter circumstances, permanent alimony is appropriate and an award of limited duration alimony is clearly circumscribed, both by equitable considerations and by statute.
[Id. at 476, 762 A.2d 1040.]
We also instructed trial judges to consider the underlying policy considerations that distinguish the forms of alimony when fashioning an appropriate alimony award. Id. at 479, 762 A.2d 1040. We concluded saying that "[p]ermanent and limited duration alimony ... reflect the important policy of recognizing that marriage is an adaptive economic and social partnership, and an award of either validates that principle." Ibid. Limited duration alimony provides flexibility for those situations when no alimony or permanent alimony would be unjust. Id. at 480, 762 A.2d 1040.
The "defining distinction" between permanent and limited duration alimony is the length of the marriage. Id. at 483, 762 A.2d 1040. Here, the judge found that the parties were married for less than ten years. She correctly considered this marriage to be of intermediate duration. The judge found, and we agree, that such a term merits an alimony award because defendant was economically dependent on plaintiff for most of the marriage and made contributions to plaintiff's medical practice in its formative stages. Hughes v. Hughes, 311 N.J.Super. 15, 33, 709 A.2d 261 (App.Div.1998). Financial dependency, however, does not dictate an award of permanent alimony in all instances.
In certain circumstances, the inability of the dependent spouse to ever earn enough income to maintain the marital lifestyle on her own may be an appropriate consideration. See Robertson v. Robertson, 381 N.J.Super. 199, 206-08, 885 A.2d 470 (App.Div.2005) (thirty-nine year old woman who surrendered employment opportunities entitled to permanent alimony after twelve-year marriage); McGee v. McGee, 277 N.J.Super. 1, 14-16, 648 A.2d 1128 (App.Div.1994) (fifty-seven year old unskilled and unemployed woman entitled to consideration of permanent alimony after relatively short-term marriage as she was economically dependent before the marriage). This factor, however, is relevant only in the determination of the length of the limited duration alimony.
Here, the record demonstrates the need to award alimony. During the second half of the marriage, defendant became economically dependent on plaintiff. Plaintiff and defendant also formed a marital partnership, particularly when plaintiff formed his private practice of medicine and defendant *1010 managed the financial, administrative and clerical affairs of the practice. There is also an educational disparity between the parties that permits plaintiff to earn substantial income at levels that defendant's education and existing skills do not permit. Yet, this is still a nine-and-one-half year marriage and defendant's complete economic dependency arose only in the last half of the marriage. The issue is not whether defendant should receive alimony but whether the alimony should be permanent or for a limited duration.
But for the mental health issue that arose in 2003 and became acute in 2005, the decision to award limited duration alimony would be unremarkable. This marriage is intermediate in length and complete economic dependency existed for a limited time. Judge Jacobson also properly rejected the implicit, if not explicit, argument that the magnitude of plaintiff's earnings during the last three years of the marriage that funded an affluent lifestyle requires an award of permanent alimony. The trial judge properly decided that plaintiff's ability to earn a handsome income was a consideration only as to the term and the amount of the limited duration alimony award.
Our review of the record also demonstrates that the finding that defendant will be able to return to the workforce is supported by the record. The judge relied not only on the medical evidence that the vast majority of persons with the same diagnosis are able to work but also on her observations of defendant throughout the eighteen-day trial and the evidence of defendant's various activities. Without discounting the effects of defendant's mental illness, the record demonstrates a woman fully involved in the life of her children and community. She travels widely. Her activities, such as tennis and fund-raising, require skill and dedication of time, energy and attention. Moreover, the judge observed defendant throughout the trial taking notes and consulting with her attorney. She was attentive and fully engaged emotionally and intellectually during the litigation process.
Finally, the term and amount of the award represent a fair and equitable response to the particular facts of this case. The ten-year term fashioned by the trial judge permits defendant to remain the primary caretaker of her children, with the considerable assistance of the household help she has enjoyed throughout the lives of her children, until the younger child enters college. In short, given the intermediate term of the marriage, defendant's age, and the limited duration of the very affluent lifestyle defendant wishes to maintain, coupled with the finding that defendant's mental health condition did not render her totally and permanently disabled, the ten-year and generous limited duration award fashioned by Judge Jacobson is an equitable response to the circumstance of both parties.

II
Defendant contends that Judge Jacobson erred in denying her request for a Mallamo[2] credit relative to underpayment of the pendente lite tax reserve. Defendant requests that we award her $126,256. We disagree.
In Mallamo, this court stated that pendente lite support orders are subject to modification prior to and at the time of entry of final judgment. 280 N.J.Super. at 12, 654 A.2d 474. Here, defendant claimed that there was an underpayment of pendente lite tax reserve and sought to have *1011 the trial judge modify the pendente lite order.
Pursuant to the pendente lite order, plaintiff was obligated to pay defendant alimony of $30,000 per month and child support of $6000 per month retroactive to January 1, 2007. Judge LeWinn determined that the adjusted monthly expenses for defendant and the children, not including certain expenses defendant paid directly, were $31,795.47 per month.
Defendant calculates that out of the $36,000 in aggregate monthly support, $31,795.47 represented living expenses for defendant and the children and $4204.53 per month remained, which represented defendant's tax reserve. Defendant claims that this amount of tax reserve is grossly inadequate due to plaintiff's failure to file joint tax returns in 2007 and 2008.
Judge Jacobson denied defendant's motion for reconsideration to include the credit. The judge noted that she "found an amount [for monthly expenses] that was less than what Judge LeWinn found" and determined there was no justification to "undo" the pendente lite order. She did, however, adjust pendente lite support with an additional sum of $2300 per year to cover the difference between defendant's estimated tax liability in 2007 and the money available to defendant due to the difference in her actual budget and pendente lite support. Thus, the judge awarded an additional $2300 per year for the pendente lite period for taxes.
Defendant has not presented any case law to support her claim that the pendente lite amount should be recalculated. Actually, Judge Jacobson's findings based on a full trial record reveal that plaintiff actually overpaid defendant during the pendente lite period. Further, having experienced a shortfall in 2007, it was incumbent on defendant to take some measures, such as trimming her expenses to address her 2008 tax liability. In addition, based on the money and assets distributed to defendant in equitable distribution, alimony, and child support, it was not an abuse of discretion for Judge Jacobson to deny a recalculation of pendente lite support to include more money for taxes.

III
Finally, defendant asserts that Judge Jacobson erred in the amount of the counsel fee awarded to defendant. Judge Jacobson awarded defendant $69,362 in counsel and expert fees. Defendant requested $227,710.18. We affirm.
Under Rule 5:3-5(c), the trial judge, in her discretion, may award counsel fees in a matrimonial action. Success in the litigation or the parties' dispute is not a prerequisite for an award of counsel fees. Guglielmo v. Guglielmo, 253 N.J.Super. 531, 545, 602 A.2d 741 (App. Div.1992). "An award of counsel fees is only disturbed upon a clear abuse of discretion." City of Englewood v. Exxon Mobile Corp., 406 N.J.Super. 110, 123, 966 A.2d 1082 (App.Div.), certif. denied, 199 N.J. 515, 973 A.2d 383 (2009). An appellate court will disturb a trial court's determination on counsel fees only on the "rarest occasions, and then only because of a clear abuse of discretion." Rendine v. Pantzer, 141 N.J. 292, 317, 661 A.2d 1202 (1995).
All applications for counsel fees in family actions must address the factors set forth in RPC 1.5(a). R. 4:42-9(b). These include the reasonableness of the fees charged given the task and the skill level of the attorney. RPC 1.5(a). The Chancery Court also should consider the following factors in an award of fees:
(1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to *1012 the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.
[R. 5:3-5(c).]
In addition, the party requesting the fee award must be in financial need and the party paying the fees must have the financial ability to pay, and if those two factors have been established, the party requesting the fees must have acted in good faith in the litigation. Guglielmo, supra, 253 N.J.Super. at 545, 602 A.2d 741.
The court in Kelly v. Kelly, 262 N.J.Super. 303, 307, 620 A.2d 1088 (Ch.Div.1992), discussed the issue of counsel fees in matrimonial cases as follows:
Fees in family actions are normally awarded to permit parties with unequal financial positions to litigate (in good faith) on an equal footing. Anzalone v. Anzalone Bros.[,] Inc. and Anzalone, 185 N.J.Super. 481, 486-[8]7 [449 A.2d 1310] (App.Div.1982). With the addition of bad faith as a consideration, it is also apparent that fees may be used to prevent a maliciously motivated party from inflicting economic damage on an opposing party by forcing expenditures for counsel fees. This purpose has a dual character since it sanctions a maliciously motivated position and indemnifies the "innocent" party from economic harm. Fagas v. Scott, [] 251 N.J.Super. [169,] 194, 197-200 [597 A.2d 571 (Law Div. 1991).]
In fashioning an attorney fee award, the judge must determine the "lodestar," which equals the number of hours reasonably expended multiplied by a reasonable hourly rate. Yueh v. Yueh, 329 N.J.Super. 447, 464, 748 A.2d 150 (App.Div.2000) (citing Rendine, supra, 141 N.J. at 334-35, 661 A.2d 1202). Judge Jacobson concluded that the lodestar for defendant was $396,085, which she divided into $224,007 for counsel fees and costs, and $172,078 for expert fees and costs. Plaintiff offered to pay $65,000 to defray these fees in addition to the amount paid through advances of equitable distribution. The judge ordered plaintiff to pay $69,362, which represents one-third of defendant's outstanding counsel and expert fees and costs. She deducted $5625 from the counsel fees, stating that amount was unreasonable because the situation only warranted one attorney when two were present.
A spouse's need for a fee award is determined by his or her income and available capital assets, and a disparity in income often suggests some entitlement to a fee allowance. Argila v. Argila, 256 N.J.Super. 484, 494, 607 A.2d 675 (App. Div.1992). The court in Argila explained that in determining whether the wife should be required to contribute to her own counsel fee, the judge should consider the amounts and liquidity of the parties' respective assets. Ibid.
A judge may deduct portions of a fee request based on duplicate staffing. In Rosenberg v. Rosenberg, 286 N.J.Super. 58, 67, 668 A.2d 84 (App.Div.1995), trial counsel appeared on the first day of trial with an associate and the judge advised counsel that he would not require the defendant to pay for a second attorney to appear at trial. Counsel certified that the plaintiff had specifically requested that the associate continue to appear with counsel *1013 during the entire trial, and the Appellate Division ruled that the judge was entitled to deduct from counsel's certification of services all charges attributable to the associate's services at trial. Ibid.
Judge Jacobson also deducted $14,000 in counsel fees related to a pendente lite motion, because the motion resulted in less net income to defendant than plaintiff had previously agreed to pay. This is proper under Yueh, supra, 329 N.J.Super. at 465, 748 A.2d 150, and Rendine, supra, 141 N.J. at 335, 661 A.2d 1202. Judge Jacobson did not reduce the amount of defendant's expert fees despite little reliance on defendant's lifestyle analysis.
Next, Judge Jacobson considered the factors set forth in Rule 5:3-5(c) and RPC 1.5(a), and concluded that the disparity in incomes favored an award of fees. She stated that defendant could pay her counsel fees, just like plaintiff will likely have to do, out of her equitable distribution. The judge found no bad faith by either party, but criticized defendant for the "reluctance to participate more fully in settlement negotiations[.]" The judge noted that plaintiff made a settlement offer in 2006 to which defendant did not respond until the eve of trial in 2008. This led to the judge's conclusion that defendant should bear a significant amount of her remaining counsel fees.
Defendant moved for reconsideration and submitted evidence of detailed efforts and attempts to resolve various issues during the divorce litigation. Defendant contends that the submissions also showed that the judge's conclusion that defendant did not respond to a 2006 settlement offer until 2008 was factually inaccurate.
Judge Jacobson explained that in addition to the failure to consider a settlement offer, she had considered other factors, including the results obtained. Some of defendant's positions, such as her request for permanent alimony, were unreasonable.
Judge Jacobson's findings are supported by substantial and credible evidence. In a letter to defendant's attorney on June 22, 2006, plaintiff's counsel made a settlement offer to defendant's counsel that was close to the ultimate award. The parties debate whether there was a meaningful response to that settlement offer, and plaintiff contends that defendant did not make a meaningful response to the offer until January 25, 2008. Plaintiff contends that the response defendant made in 2006 was that she would not accept anything less than permanent alimony. Plaintiff adds that defendant also refused to participate in a blue ribbon early settlement panel or to engage in mediation.
Judge Jacobson noted that even if additional expert discovery was required, as maintained by defense counsel, the parties could have started negotiations with the help of a mediator or blue ribbon early settlement panel. The judge contrasted this behavior with plaintiff's conduct, noting plaintiff did not quibble over many things. For example, plaintiff voluntarily agreed to permit defendant to stay in the marital home and retain all furnishings without a credit.
There is a basis in the record for the judge's conclusion that defendant did not make a strong attempt to settle the case. However, on reconsideration, the judge considered the record absent the claim of defendant's failure to timely consider settlement and concluded that she would still reach the same result as to the percentage of fees awarded.
Affirmed.
NOTES
[1] Prior to the enactment of N.J.S.A. 2A:34-23(f), the statute did not permit a judge to award limited duration alimony but litigants could and did negotiate a limited duration award and it was commonly referenced as "term" alimony.
[2] Mallamo v. Mallamo, 280 N.J.Super. 8, 12, 654 A.2d 474 (App.Div.1995).