**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1703-19

L.M.,

    Plaintiff-Appellant,

v.

A.M.,

    Defendant-Respondent.

_____

> Argued January 26, 2021 – Decided April 30, 2021
>
> Before Judges Gilson, Moynihan, and Gummer.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FM-04-1330-18.
>
> Kourtney A. Borchers argued the cause for appellant (Weinberger Divorce & Family Law Group, LLC, attorneys; Kourtney A. Borchers, on the brief).
>
> Carolyn G. Labin argued the cause for respondent (Klineburger and Nussey, attorneys; D. Ryan Nussey and Carolyn G. Labin, on the brief).

PER CURIAM

In this appeal of post-judgment matrimonial orders, plaintiff L.M. (Lucy)[1] argues the denial of her application to relocate to Pennsylvania with the parties' then twelve-year-old child was erroneous because, among other reasons, the trial judge erred in his interview of their child, improperly focused on Lucy's stipulation that she would not move without their child, and did not correctly analyze the best interests of the child pursuant to Bisbing v. Bisbing, 230 N.J. 309 (2017). She also appeals an order awarding defendant A.M. (Adam) counsel fees and costs incurred in connection with her motion for reconsideration and an order granting Adam additional parenting time. We affirm the orders denying the relocation motion and granting additional parenting time and reverse the counsel fee award.

## I.

Lucy and Adam were married in 2004 and had one daughter, R.M. (Ruth), who was born in 2007. The parties separated in 2012 and divorced in 2018. Their final judgment of divorce incorporated their settlement agreement. They agreed to share joint legal custody of Ruth, with Lucy being the parent of primary residence and Adam being the parent of alternate residence, having

---

[1] We use fictitious names for ease of reading and to protect the identities of the parties. R. 1:38-3(d)(13).

parenting time every other weekend. Adam, at times, also would see Ruth during the week. That arrangement had been in place since their separation in 2012.

In October 2018, Lucy met Joan in person after having communicated with her online since April. Lucy and Joan became engaged in December 2018 and married in April 2019. About two months later, Lucy filed a motion to relocate with Ruth to Pennsylvania, where Joan and her seven-year-old daughter lived, over three hours from where Adam lived in New Jersey. Adam filed a motion for primary residential custody and to establish new parenting plans depending on whether Lucy relocated with Ruth. Adam planned to continue to live in New Jersey with his fiancé Charlene and her eight-year-old son, less than twenty minutes from where Ruth lived with Lucy.

At oral argument on the parties' motions, counsel for both parties stated their agreement that the judge should interview Ruth and conduct a plenary hearing. The judge gave counsel an opportunity to submit ten questions before the interview.

Ruth was almost twelve on the day of the interview. After explaining that his "job" was to act in her best interests and giving her an opportunity to ask him questions, the judge began the interview by asking Ruth to tell him about

herself. The first thing Ruth said was that she played field hockey and other sports. She talked about her extensive involvement in multiple sports and spending time with friends. When he asked her if she knew why she was meeting with him, Ruth answered, "[b]ecause you're trying to figure out where I'm going to live."

The judge inquired about her living arrangements in New Jersey and in Pennsylvania. He asked Ruth, "do you get along with [Joan]?" She answered, "[n]o." The judge requested that Ruth "[t]ell me about that."

> [RUTH]: Like I never liked her, ever, like but my mom said that she thought I didn't like her -- I meant she thought I liked her in the beginning, but I just thought that it wouldn't last because all of her other girlfriends didn't so I just like assumed, so I didn't want to like hurt her feelings I guess by telling her I didn't like her.
>
> THE [JUDGE]: Okay. And why -- what about her don't you like?
>
> [RUTH]: She's like really like awkward and she never talks, like ever. Like she doesn't even really talk to my mom and she's just like awkward and she's like really like smart -- she tries to be smart and make like smart comments. Like my mom -- out of coming out of like Wawa or something, like she made me hold the door for her and she was like first time -- like first time I've seen you do something nice for me or something.

The judge asked her about her relationship with Adam's fiancé Charlene.

4

[RUTH]: Um, I don't know, they're like really nice and I kind of -- I kind of like having them around better cause I feel like -- I don't know, they're just like -- they make things easier I feel like. I don't know. And like [Charlene's son's] someone to like hang out with and stuff because I really like him.

The judge asked her which parent she talks to more when she has problems. She answered, "I don't really talk to . . . either of them." He asked her which parent she would call first if she were hurt. She responded, "[p]robably my mom." She began to cry after that response. When the questioning resumed, she told the judge she would call her mom if she were hurt because she lived with her. She stated both parents attended her sports events and described the activities she liked to do with each parent.

The judge asked Ruth if she understood that she would have to change schools whether she moved with her mother to Pennsylvania or moved to live with her father in New Jersey. Ruth believed she could stay at her school if she lived with her father. The judge explained that she likely would not be able to stay at the same school if she lived with her father because he lived in a different school district. Having explained that to her, he asked if she had a preference about where to attend school.

THE [JUDGE]: Now, I guess one of the -- I have to ask this, I know that you love both your parents, but where

5

do you want to go to school, in Pennsylvania or in New Jersey?

[RUTH]:  New Jersey.

THE [JUDGE]:  Why?

[RUTH]:  Because if I go to New Jersey I can still play for my club team --

The portion of the interview about which Lucy now objects began just after that exchange.

THE [JUDGE]:  And, I mean, in picking between living with your dad and your mom, is it equal?  I mean, do you prefer living with your mom?  Do you prefer living with your dad?

[RUTH]:  Like --

THE [JUDGE]:  The problem is with the fact that you're -- you don't get along with [Joan] --

[RUTH]:  Yeah.

THE [JUDGE]:  -- so what you're saying is that if it was just your mom and you had to move to Pennsylvania, you'd want to live with her?  No?

[RUTH]:  Maybe.  Yeah, probably.  I don't know.

THE [JUDGE]:  So -- so what I'm hearing is, even though you didn't quite say it this way --

[RUTH]:  Ah-huh.

A-1703-19

THE [JUDGE]:  -- if it was just your mom versus your mom and [Charlene], it would be kind of equal --

[RUTH]:  Mm-hmm.

THE [JUDGE]:  -- but if it's a choice between your dad and [Charlene] and your mom and [Joan], you want to live with your dad and [Charlene]?

[RUTH]:  Mm-hmm.

THE [JUDGE]:  It feels more like a family with them?

[RUTH]:  Mm-hmm.

Later in the interview, the judge asked Ruth an open-ended question.

THE [JUDGE]:  What else -- is there anything that you want to tell me especially?

[RUTH]:  I guess that like it's not like -- my grandma too, like she lives right -- right near my dad, so if I live with my dad I still get to see her.

THE [JUDGE]:  Are you close with your grandmom?

[RUTH]:  Mm-hmm.

THE [JUDGE]:  Did your dad tell you to tell me about your grandmom?

[RUTH]:  (No audible response).

THE [JUDGE]:  No.  Does your mom have any family around here?

[RUTH]:  My grandma.

THE [JUDGE]:  So that's your grandma that you just mentioned?

[RUTH]:  Mm-hmm.

THE [JUDGE]:  So that's your -- your mom's mother?

[RUTH]:  Yeah, my other grandma lives in Florida but only comes up in the summer because she has a camp ground down here.

THE [JUDGE]:  Okay.  Do you like spending time with your grandmom?

[RUTH]:  Mm-hmm.

THE [JUDGE]:  Do you see her a lot now?

[RUTH]:  Like probably like once every week.  It used to be less because I feel like then -- I don't know --

THE [JUDGE]:  What kinds of things --

[RUTH]:  I feel like I've gotten closer like for the last year I guess, I feel like I got closer with her.

THE [JUDGE]:  Okay.   What kind of things do you do with your grandmom?

[RUTH]:  Um, we go shopping and she has like -- like a garden and stuff, and like --

The judge asked Ruth if her parents talked to her about each other.

THE [JUDGE]:  Does your dad at all talk about your mom?

[RUTH]:  Not usually.

A-1703-19

THE [JUDGE]: Does your mom ever talk about your dad?

[RUTH]: I mean, like she was like talking about how he like only sees me like four days in the month -- that he only sees me like four days in a month or something, and that -- and like that I -- she wondered why I wanted to live with him.

The judge asked her with whom she would want to live if she did not have to move.

THE [JUDGE]: I'm not sure -- I mean, if you didn't have to move, you'd want to stay with your mom?

[RUTH]: Not really.

THE [JUDGE]: Not really.

Before the end of the interview, the judge asked Ruth if she had any questions.

[RUTH]: If like -- if you were -- like you have no -- like you can't like control where she -- like where my mom moves like at all, right?

THE [JUDGE]: No --

[RUTH]: Like --

THE [JUDGE]: -- but what I -- what I can do is say if she moves, then you're going to live with your dad.

[RUTH]: Mm-hmm.

9

THE [JUDGE]:  I can't say that she can't move.  All I can say is that if she moves, you stay with your dad.  But it seems to me from what you said, it's not about where she lives --

[RUTH]:  Mm-hmm.

THE [JUDGE]:  -- it's about with who she lives --

[RUTH]:  Mm-hmm.

THE [JUDGE]:  -- and that you -- you would like things to stay the same as they are right now, but if your mom is going to live with [Joan], you'd rather be with your dad because it's more of a family.

[RUTH]:  Mm-hmm.

THE [JUDGE]:  Is that kind of --

[RUTH]:  Yeah.

THE [JUDGE]:   -- that's kind of right?  So that like let's suppose that it was just -- there was no [Joan] but your mom was moving three hours away, you'd rather live with your mom --

[RUTH]:  No.

THE [JUDGE]:  I'm sorry?

[RUTH]:  Wait -- I wouldn't.

THE [JUDGE]:  You wouldn't?

[RUTH]:  No, I would rather be with dad.

THE [JUDGE]:  You just want to stay here.

A-1703-19

[RUTH]:  Yeah, I would live with my dad.

The judge subsequently conducted a two-day plenary hearing.  Lucy did not at any time before or during the hearing object to the judge's conduct of Ruth's interview.

At the beginning of the hearing, the parties stipulated to the entry of certain exhibits into evidence.  Adam's counsel then described the applications pending before the court:  "there was the motion filed by [Lucy] to relocate.  My client filed a motion the same day to expand his parenting time, [and] deny the right to relocate.  Or in the alternative she stays in . . .  New Jersey to expand parenting time."  The judge asked if Lucy intended to relocate without Ruth if he denied her application.  Her lawyer did not object to the question and stated Lucy would not relocate without Ruth.  The judge then asked Adam's attorney whether Adam would continue to seek primary residential custody if Lucy's relocation motion was denied.  The attorney stated Adam would not seek a change in primary residential custody if Lucy remained in her home and Ruth in her school.  After an off-the-record conference, the judge asked if counsel had any stipulations to place on the record in addition to the evidential stipulations they already had made.  Lucy's attorney stated Lucy would "stipulate that she's going to remain in New Jersey if her application is denied."  The judge

11

responded, "[s]o then we have to make a determination on whether or not to grant the application to relocate. . . . [T]he [c]ourt . . . is going to require that [Lucy] proceed first with her application to relocate." Lucy's counsel did not object to that procedure.

Lucy, her wife, one of Ruth's teachers, and one of her coaches testified at the hearing. Lucy testified that although Ruth initially "got along great" with Joan, Lucy noticed a change in Ruth's attitude after the engagement. After the wedding, Ruth told Lucy in multiple conversations she did not like Joan and did not want to move. Lucy confirmed Ruth had indicated she wanted to live with Adam if Lucy moved to Pennsylvania. Joan testified that "[w]e all get along great" but conceded she found Ruth "a bit challenging to talk to at times" and that her relationship with Ruth, though "very rewarding," has been "challenging at times." She likened Ruth to her previous stepdaughter: "this is not my first go around with stepdaughters . . . my last one was challenging at this age as well." Joan also testified that "as things progressed," Ruth's "new line of thought was that I was a terrible person, and she couldn't move because she didn't like me suddenly" and that "at one point" Ruth had said "she didn't like me because I am the worst."

A-1703-19

After Lucy concluded the presentation of her evidence, Adam's attorney moved for a directed verdict on Lucy's motion to relocate with Ruth, contending Lucy had presented no evidence establishing that it was in Ruth's best interests to relocate.

Opposing the motion, Lucy's attorney asserted the judge needed to hear testimony from Adam and Charlene – even though she had not called them as witnesses in Lucy's case in chief or listed them on her witness list. She dismissed Ruth's stated preference to live with her father if her mother moved, stating Ruth "probably changes her mind several times a day." As for Ruth's extensive athletic involvement, she contended "[t]hey have sports in Pennsylvania." She asserted "Ruth needs to be with Mom." She argued the judge should not consider the stipulation she had placed on the record that Lucy would not move if the judge denied her motion to relocate.

The judge expressed his belief that he should consider the stipulation, noting Ruth's preference to live with Adam if Lucy moved and to live with Lucy if Lucy stayed. He stated, "there's a number of factors here that play out in [Lucy's] favor if this were a true custody case if she stays that do[] not play out if she relocates." The judge advised counsel: "if you tell me that I have to decide custody . . . in this case because I have to assume your client will leave

A-1703-19

then we have to continue the trial" and "you have not in my mind established that it's in the best interest of this child to relocate, other than for staying with her mother."  The judge gave counsel an opportunity to speak with her client, stating, "I'm telling you right now if you are not putting custody at issue then I'm going to grant the directed verdict and deny the application."  In response to a question from Lucy's counsel, the judge confirmed that Lucy risked losing custody if Adam's custody motion remained before the court.

Two weeks later, the judge placed his oral decision granting the directed-verdict motion on the record.  He began by rejecting Lucy's counsel's argument that he should consider Lucy's stipulation that she would remain in New Jersey if he denied her motion to relocate with Ruth only in his determination of Adam's residential-custody motion and not in Lucy's relocation motion.  He found the stipulation to be relevant and "dispositive":  "this fact that the mother-plaintiff would remain the parent of primary residence even if the motion was denied[] was outcome determinative."  He noted that Adam's counsel had represented that Adam would not pursue his request for residential custody if the judge denied Lucy's motion for relocation.  Assuming all facts presented by Lucy were true, the judge granted Adam's directed-verdict motion and denied Lucy's motion, finding it was not in Ruth's best interests to relocate.

The judge addressed each of the factors required by the Legislature in N.J.S.A. 9:2-4(c) to be considered by a court in determining the best interests of a child in custody disputes. He made the following factual findings as to those factors:

> 1. "the parents' ability to agree, communicate and cooperate in matters relating to the child": after the first couple of years following their divorce, Lucy and Adam generally were able to communicate and co-parent, except Lucy "had recently bad-mouthed" Adam;
>
> 2. "the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse": both parents were willing to accept custody and had not had "any material problems with allowing parenting time";
>
> 3. "the interaction and relationship of the child with its parents and siblings": Ruth had a good relationship with both parents, had a stronger bond with Lucy, had "difficultly" with Adam's fiancé, got along with her, and had a "good relationship" with Joan and her daughter until "relocation became an issue";
>
> 4. "the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision": Ruth wanted to stay with Adam if Lucy moved and Lucy if Lucy did not move;
>
> 5. "the needs of the child": Ruth's needs "would be met by either parent," but based on Lucy's case in chief, Lucy was best able to meet her needs;
>
> 6. "the quality and continuity of the child's education": the judge found the schools in the districts where Joan

15

and Adam resided to be comparable and noted Ruth would have to change schools only if he granted the relocation motion;

7. "the fitness of the parents": based on the facts presented by Lucy, both parents were fit, but Lucy "was the superior parent";

8. "the geographical proximity of the parents' homes": noting Ruth's extensive athletic involvement, the judge found a relocation three hours and twenty minutes away would likely result in "the marginalization of the father";

9. "the extent and quality of the time spent with the child prior to or subsequent to the separation": Adam was "active in his involvement in the child's life."

The judge found the other factors not to be materially at issue.

The judge recognized that in addition to those statutory factors, he had to "consider and articulate why [his] decision is deemed to be in the child's best interest[s]," citing Terry v. Terry, 270 N.J. Super. 105, 119 (App. Div. 1994). The judge found as the only factors favoring relocation: Lucy would be able to remain the parent of primary residence and Ruth could "potentially build a stronger relationship" with Joan and her daughter. He found as a negative "the material impact" relocation would have on Adam's "parenting time and relationship" with Ruth.

Standing alone, the relationship with the plaintiff's new spouse and stepdaughter were vastly outweighed by the

16

> impact on Ruth's relationship with her father and his new family.
>
> When the [c]ourt considered the evidence that plaintiff would not move if the relocation was denied so she could keep custody of the child, any marginal benefit that possibly existed in favor of granting relocation for the child was vastly outweighed by the benefit of remaining in New Jersey.

The judge concluded by noting "the current determination that the plaintiff is the parent best able to provide for Ruth is solely based on plaintiff's unrebutted testimony presented in her case in chief." The judge denied Lucy's application to relocate with Ruth and denied Adam's application to be designated the parent of primary residence. In an October 16, 2019 order, the judge memorialized those denials and directed the parties to discuss resolution of Adam's request for an increase in his parenting time.

Lucy moved for reconsideration and for a new trial, asserting the judge had "relied heavily on a material misrepresentation made by Ruth." According to Lucy, after the judge denied Lucy's motion, Ruth told Lucy that she would choose to move to Pennsylvania with her rather than live in New Jersey with Adam. Lucy represented that Ruth had made that statement after she and Joan had spoken to Ruth about Adam's pending motion for additional parenting time. Lucy related that Ruth had become very upset during their conversation and,

after she calmed down, told them "she may have misrepresented her true feelings when she first spoke" with the judge. According to Lucy, "Ruth now appreciates how powerful and influential her representation to the court and to her parents was; and she is now remorseful for answering in a way that while seemed to be in her best interest, it may not have been completely accurate." Lucy asserted that if Ruth had told the judge she wanted to stay with Lucy if she moved, Lucy would have moved forward with the trial and might have given a different answer to the judge's question about whether she would relocate without Ruth if she lost the relocation motion. She accused Adam of influencing Ruth prior to her interview with the judge. She asked the judge to interview Ruth again. In addition, Lucy faulted the judge for deciding the directed-verdict motion when she had not had an opportunity to cross-examine Adam and for considering her stipulation.

Adam opposed Lucy's motion and cross-moved for an order directing Lucy and Joan to stop discussing this matter with Ruth, to enforce the Children's Bill of Rights attached to a prior order, and awarding him counsel fees and costs. In his certification, Adam stated that Lucy "has commenced an attack on Ruth" and that Ruth has been punished for saying she wanted to stay in New Jersey. Lucy denied those accusations in a reply certification.

The judge denied Lucy's motion. He rejected her argument about the stipulation, finding again that it was relevant under N.J.R.E. 401 and material. He rejected her argument that he had erred in deciding the directed-verdict motion without hearing Adam's testimony, noting that her counsel had not included Adam in her witness list and had not moved to re-open the record. He rejected her argument that Ruth's purported change in position based on her greater understanding of the impact of her interview statements merited reconsideration. He noted Lucy's testimony that Ruth wanted to stay in New Jersey if she moved to Pennsylvania and that "there was no dispute at the time of trial what the child wanted." He denied the motion for reconsideration and for a new trial, finding his decision was not arbitrary or capricious.

As for Adam's motion, the judge did not find a violation of the Children's Bill of Rights but directed the parties to comply with it. The judge granted Adam's fee application, considering the factors enumerated in Rules 4:42-9 and 5:3-5(c) and finding "no true basis for the position being asserted by [Lucy] for reconsideration." The judge awarded $3,014.00 in counsel fees and costs and stayed enforcement of the fee award pending appeal. He memorialized those decisions in a December 12, 2019 order.

On January 8, 2020, the judge issued an order regarding Adam's application for more parenting time, granting Adam additional overnight parenting time on Thursday in the weeks he does not have weekend parenting time and one weekday from after school to 8:00 p.m.

II.

In this appeal, Lucy argues that the judge failed to make any findings of fact or conclusions of law in denying Lucy's motion to relocate with Ruth; improperly granted Adam's directed-verdict motion without hearing testimony from Adam; gave too much weight to Lucy's stipulation that she would not move without Ruth and "virtually ignored" the other factors under N.J.S.A. 9:2-4; improperly conducted Ruth's interview by asking her to choose between her parents and not allowing her "to voice her opinion"; and improperly awarded Adam counsel fees.

Our review of a family judge's factual findings is limited. <u>N.J. Div. of Child Prot. & Permanency v. J.B.</u>, 459 N.J. Super. 442, 450 (App. Div. 2019). We defer to a family judge's factual findings when supported by substantial, credible evidence in the record because the judge "has the superior ability to gauge the credibility of the witnesses who testify" and has "special expertise in matters related to the family." <u>N.J. Div. of Youth & Fam. Servs. v. F.M.</u>, 211

N.J. 420, 448 (2012); see also Cesare v. Cesare, 154 N.J. 394, 413 (1998). "We recognize that the cold record, which we review, can never adequately convey the actual happenings in a courtroom." Ibid. We intervene only when a trial judge's factual conclusions are "so wide of the mark" that they are "clearly mistaken." N.J. Div. Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We review de novo a judge's legal conclusions. J.B., 459 N.J. Super. at 451. We review an award of counsel fees under an abuse-of-discretion standard. J.E.V. v. K.V., 426 N.J. Super. 475, 492 (App. Div. 2012).

### A.

In N.J.S.A. 9:2-4, the Legislature provided a list of factors courts "shall consider" in deciding custody disputes. One of those required subject matters is "the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision." Ibid. Thus, the right of a child of sufficient age and capacity "to participate in the decision-making process" in a custody dispute is a statutorily-protected right. Mackowski v. Mackowski, 317 N.J. Super. 8, 12 (App. Div. 1998). As we found in Mackowski, "[t]he child has a right to be heard and voice an opinion to the finder of fact and ultimate decision-maker." Ibid.; see also D.A. v. R.C., 438 N.J. Super. 431, 457 (App. Div. 2014).

Rule 5:8-6 authorizes a court "on its own motion or at the request of a litigant [to] conduct an in camera interview with the child[]" at the center of a custody dispute.  Both parties agreed the judge should interview Ruth; neither party questioned her age or capacity.

Having raised no objection to the interview before or during the trial, Lucy on appeal now argues the judge improperly required Ruth to choose between her parents and thereby tainted his decision on Lucy's relocation motion.  To support that argument, Lucy selectively picked out approximately one transcript page from a thirty-two-page transcript, ignoring the critical, clear, and direct statements Ruth made earlier in the interview.

The substance of the interview began with the judge's simple request that Ruth "tell [him] about [her]self."  In response to that request, Ruth told him about her athletic activities, her school, her coach, her friends, and her living arrangements.  See Mackowski, 317 N.J. Super. at 13 ("A carefully conceived and conducted interview can produce facts, including, among other things, information about interests, activities with parents, living arrangements and friends[.]").  The judge asked Ruth, "do you get along with [Joan]?"  When she answered, "[n]o," the judge made the broadly-worded request:  "[t]ell me about that."  Ruth then told the judge that she never liked Joan and explained why she

didn't like Joan.  He asked the same questions about Charlene.  He asked her neutral questions about what activities she liked to do with her parents.  He asked her where she preferred to go to school, and she answered New Jersey so she could continue to play for her club team.

All of that discussion came before the colloquy to which Lucy now objects.  That colloquy, instead of being improper questioning causing Ruth to choose between her parents, id. at 13, was confirmation of the opinion Ruth already had voiced:  she preferred to live with Adam and Charlene in New Jersey and not Lucy and Joan in Pennsylvania.

Ruth expressed that opinion earlier in the interview and to Lucy before the trial and the interview.  We know Ruth discussed her preference with Lucy before the interview because Ruth told the judge Lucy "wondered why I wanted to live with him" when she spent only four days with Adam each month.  The statements Ruth made in her interview were consistent with Lucy's and Joan's testimony regarding Ruth's extensive involvement in sports, the geographic distance between Adam's and Joan's houses, Ruth's dislike of Joan once relocation became an issue, and Ruth's preference to live with Adam if Lucy moved.

A-1703-19

Ruth's stated preference was not the product of improper questioning by the judge. She held that preference before she had any interaction with the judge. Even if we found Lucy's argument regarding the interview persuasive – and we don't – and disregarded Ruth's interview, the conclusions the judge reached based on the interview would be equally supported by Lucy's and Joan's testimony.

Lucy's appeal of the parenting-time order is premised on the alleged errors committed by the judge during Ruth's interview. Because we find her argument regarding the interview unpersuasive, we affirm the parenting-time order.

## B.

N.J.S.A. 9:2-2 prevents a parent from relocating a minor child out of state without the consent of the other parent or leave of court. "[T]he purpose of the statute is to preserve the rights of the noncustodial parent and the child to maintain and develop their familial relationship." Cooper v. Cooper, 99 N.J. 42, 50 (1984). Accordingly, the Legislature required a showing of "cause" before a court authorizes the removal of a child to another state. Bisbing, 230 N.J. at 323.

To determine whether cause exists for relocation when parents share legal custody, a judge "should conduct a best interests [of the child] analysis." Id. at 335. In that analysis, a judge considers "all relevant factors set forth in N.J.S.A. 9:2-4(c), supplemented by other factors as appropriate." Id. at 338. A judge deciding a child-custody dispute "must reference the pertinent statutory criteria with some specificity" and "consider and articulate why [his or her] custody decision is deemed to be in the child's best interest." Terry, 270 N.J. at 119.

And that is what the judge did here. In his decision, he addressed each of the factors listed in N.J.S.A. 9:2-4(c).[2] He also articulated why a denial of Lucy's relocation motion was in Ruth's best interests, finding that the benefit of relocation to "the relationship with the plaintiff's new spouse and stepdaughter [was] vastly outweighed by the impact on Ruth's relationship with her father and his new family" and that "any marginal benefit that possibly existed in favor of granting relocation for the child was vastly outweighed by the benefit of remaining in New Jersey."

---

[2] Lucy's assertions that the judge "failed to make any findings of fact or conclusions of law" in denying her motion to relocate with Ruth or considered the required factors "minimally" or in a "perfunctory" way are belied by the record and by her lawyer's acknowledgement at a subsequent proceeding that "Your Honor went through all of the factors" and "Your Honor went through all of them and didn't just consider one factor."

A-1703-19

Lucy faults the judge for considering and giving too much weight to her stipulation that she would not move if her relocation motion was denied. In making that argument, Lucy ignores the procedural posture of the case. Because Adam's counsel had advised the judge that Adam would withdraw or proceed with his custody motion depending on how Lucy's relocation motion was decided, the judge opted to proceed first with Lucy's relocation motion. Lucy did not object to that procedure, and we find no error in it. She also ignores that she relayed her plan to remain in New Jersey if her motion was denied not just in response to an unobjected-to question but also in a stipulation she chose to place on the record.

Moreover, her stipulation was directly relevant to the preference-of-the-child factor of N.J.S.A. 9:2-4(c). As to that factor, the judge made the factual finding that Ruth preferred to stay with Lucy if Lucy remained in New Jersey and to live with Adam if Lucy relocated. Thus, Ruth's preference varied based on whether Lucy would relocate, making the stipulation directly relevant to this factor. See N.J.R.E. 401 (defining "relevant evidence" as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action"); N.J.R.E. 402 (making "all relevant evidence . . . admissible" subject to certain limited exceptions). Lucy's stipulation was also

directly relevant to the continuity-of-education factor because, as the judge found, Ruth would remain in the same school if the relocation motion was denied and she remained with Lucy. It was also relevant to the judge's consideration of the factor regarding the geographical proximity of the parents' homes.

Although the judge noted in his decision that Lucy's stipulation was "outcome determinative," he clearly considered each of the factors of N.J.S.A. 9:2-4(c) and, considering each of those factors, ultimately concluded that it was in Ruth's best interest to deny the motion because "any marginal benefit that possibly existed in favor of granting relocation for the child was vastly outweighed by the benefit of remaining in New Jersey."

Lucy also faults the judge for granting Adam's motion for a directed verdict on her relocation motion without hearing testimony from Adam. Under Rule 4:40-1, a party may move for a directed verdict "at the close of the evidence offered by an opponent." A judge must deny a directed-verdict motion if the evidence supporting the position of the party opposing the motion and the legitimate and reasonable inferences from that evidence could sustain a judgment in favor of the opposing party. Vitale v. Schering-Plough Corp., 447 N.J. Super. 98, 119-120 (App. Div. 2016); see also Sackman v. N.J. Mfrs. Ins.

Co., 445 N.J. Super. 278, 290-91 (App. Div. 2016). We apply the same standard. Id. at 120.

Here, Adam moved for a directed verdict after Lucy had completed presentation of her evidence. That evidence did not include Adam's testimony[3] because Lucy chose not to call him as a witness and, as shown by her pre-trial witness list, never intended to call him even though she could have. See N.J.R.E. 611(c) (permitting a party to use leading questions when examining an adverse party); Lerman v. Lerman, 245 N.J. Super. 312, 318 (Ch. Div. 1990) (finding a party in a divorce action may call an adverse party as a hostile witness). The judge expressly considered as true the evidence she presented and all legitimate and reasonable inferences from that evidence. To accept Lucy's argument would be the equivalent of barring directed-verdict motions in custody disputes. No rule or case mandates that result. We see no basis to adopt that argument or to disturb the judge's decision.

---

[3] Lucy suggests that Adam's testimony was necessary in part because the judge had admitted documentary evidence from Adam at the beginning of the hearing. The evidence was admitted as a result of the parties' joint stipulation. Moreover, the judge made no reference to that evidence in his decision and, thus, apparently did not deem it material.

Finding no error in the judge's conduct of the interview or denial of Lucy's relocation motion following Adam's directed-verdict application, we affirm the October 16, 2019 order denying the relocation motion.

C.

Pursuant to N.J.S.A. 2A:34-23 and Rules 4:42-9(a)(1) and 5:3-5(c), a judge in his or her discretion may award counsel fees to a party in a family action. J.E.V., 426 N.J. Super. at 492. In addition to the factors set forth in RPC 1.5(a) and Rule 4:42-9(b), a judge deciding a fee application should consider:

> (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.
>
> [R. 5:3-5(c).]

"[T]he party requesting the fee award must be in financial need and the party paying the fees must have the financial ability to pay, and if those two factors have been established, the party requesting the fees must have acted in

29

good faith in the litigation." J.E.V., 426 N.J. Super. at 493; see also Mani v. Mani, 183 N.J. 70, 94-95 (2005). Fees are awarded in family actions "to permit parties with unequal financial positions to litigate (in good faith) on an equal footing." Kelly v. Kelly, 262 N.J. Super. 303, 307 (Ch. Div. 1992). Whether a party in a family action has a financial need meriting a fee award "is determined by his or her income and available capital assets, and a disparity in income often suggests some entitlement to a fee allowance." J.E.V., 426 N.J. Super. at 494.

The judge considered the Rule 5:3-5(c) factors but, as to the financial factors, found only that "[t]here is no significant evidence in this case about the financial circumstances of the parties" and "[t]here is no significant information in this case regarding the ability of the parties to pay their own fees or to contribute to the fees of the other party." He acknowledged the requirement that he consider "whether the party requesting the fees is in financial need [and] whether the party against whom the fees are sought has the ability to pay," citing Mani, 183 N.J. 70, but he did not make findings as to whether Adam had a financial need or Lucy had the ability to pay. That omission was an abuse of discretion.

In support of his cross-motion for fees, Adam did not assert that he had a financial need for a fee award or that Lucy had the ability to pay his requested

30                                                                          A-1703-19

fee award. During oral argument, Adam's counsel did not argue that Adam had a financial need or that Lucy had an ability to pay. As the judge found, the motion record contained "no significant evidence" about the parties' financial circumstances or ability to pay fees. Without that evidence, the judge erred in granting Adam's cross-motion for counsel fees. Thus, we reverse the aspect of the December 12, 2019 order granting the cross-motion for counsel fees and costs.

Affirmed as to the October 16, 2019 order denying the relocation motion and the January 8, 2020 order granting Adam additional parenting time and reversed as to the December 12, 2019 counsel fee award.

Affirmed in part and reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION