**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3545-20

C.M.E.,

    Plaintiff-Respondent,

v.

M.E.,

    Defendant-Appellant.

_____

Submitted September 12, 2022 – Decided September 29, 2022

Before Judges Mayer and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FM-15-0891-19.

The Goldstein Law Group, attorneys for appellant (David M. Meth, of counsel and on the briefs; Mark Goldstein, on the briefs).

Charles C. Berkeley, attorney for respondent.

PER CURIAM

Following a dissolution trial in the Family Part, defendant M.E.[1] appeals from certain provisions of a June 28, 2021 judgment of divorce (JOD).[2] We affirm in part, and vacate and remand in part for further proceedings.

I.

Defendant and plaintiff C.M.E. married in March 2014; six months later, plaintiff gave birth to the parties' only child, A.E. (Ann). At that time, defendant worked as a heavy equipment operator for his father, earning approximately $80,000 per year. Although plaintiff briefly worked during the marriage as a waitress and a part-time nursing assistant, the parties agreed she would stop working and stay at home with Ann. But because plaintiff received a $100,000 inheritance from her great uncle in 2014, she continued contributing to the parties' household expenses, paying off defendant's credit card debt of approximately $14,000, $22,000 in rental expenses for the family, and "all debts between the two of" them.

---

[1] We use initials for the parties and a pseudonym for their daughter to protect their privacy. R. 1:38-3(d)(10).

[2] The original JOD from June 24, 2021 was amended on June 28, 2021 to correct a clerical error.

A-3545-20

In March 2015, defendant was injured at work when "a manhole cover dropped into . . . [a] chute," causing "an electrical explosion." The Social Security Administration (SSA) deemed him permanently disabled due to injuries he sustained in the accident. Defendant later received a settlement from his former employer for "lost wages" totaling approximately $320,000. In 2018, he received a lump sum payment of roughly $90,000 from the SSA for "back wages."

When Ann was approximately eight months old, plaintiff discovered certain family bills were not being paid. She confronted defendant and he revealed he had a gambling addiction. After defendant confessed that he "gambled everything," plaintiff "took over" the family's finances.

During the next few years, the parties experienced significant marital discord. Defendant attributed the breakdown of the marriage to a change in plaintiff's "demeanor" after she underwent bariatric surgery in 2018. Plaintiff contended the marriage suffered from defendant's fixation with various lawsuits after his 2015 accident. According to plaintiff, defendant provided "[v]ery little" assistance with household chores and "would just lock himself up" to "work[ on] . . . his workers' comp[ensation] case, his personal injury case, and that was his job, so he said."

3

In January 2019, plaintiff filed for a temporary restraining order, alleging defendant physically assaulted her.  She obtained a final restraining order (FRO) following a trial before the same judge who presided over the parties' divorce trial.[3]

In February 2019, plaintiff filed a complaint for divorce.  Although the parties retained counsel and attempted to mediate their differences, they were unsuccessful.

By the time the divorce trial began in February 2021, the parties were no longer represented by counsel.  They proceeded to trial virtually, due to COVID-19 restrictions.  Because the parties appeared without counsel, the judge elicited testimony directly from them and allowed them to cross-examine each other, despite that plaintiff's FRO barred defendant from communicating with her.[4]

Initially, the judge questioned plaintiff about her educational and employment background.  She testified she was a high school graduate and a

---

[3]  We were not provided with transcripts from the domestic violence proceeding.

[4]  The transcripts from the dissolution trial show the judge repeatedly had to instruct the parties not to interrupt each other; he also had to remind defendant several times he would "not . . . retry [the parties' domestic violence] case" as part of the divorce trial.

certified phlebotomist. Additionally, she stated she was unemployed and collecting $230 per week in unemployment benefits "because of [COVID]" and having to "homeschool [Ann] three days a week." Plaintiff anticipated that once Ann returned to school full-time, she would resume her part-time job as a nursing assistant and earn $17.50 per hour. Plaintiff estimated she would gross $408 per week by working three eight-hour shifts a week.

The judge asked plaintiff why she could not work a forty-hour week. She explained she was "in school full-time," and reiterated she was "homeschooling [Ann] three days a week." Plaintiff also stated she was pursuing an Associate degree at Ocean County College, and hoped to secure a bachelor's degree in elementary education by the end of 2023.

Regarding her requests for alimony and child support, plaintiff stated defendant "bankrupt[ed]" her and "continue[d] this court stuff for the last two years [by] just playing these games." Accordingly, she testified she was "broke" and sharing household expenses by living with her brother and father.

Plaintiff acknowledged Ann received "derivative benefits" of $674 per month and a lump sum payment from the SSA of approximately $31,000 based on defendant's disability. But she was concerned defendant owed over $7,000 in support arrears, a debt she believed "should have been cleared up with any

5

money [defendant] received." Plaintiff explained defendant was awarded approximately $90,000 in back wages from the SSA, but "went and . . . spent [it] down in Atlantic City." Further, she recalled that despite being ordered by the court not to spend a state income tax refund, "he came into the courtroom and said, 'no sorry, gambled that, too.'"

Challenging defendant's claim he could not pay child support or alimony, plaintiff pointed out "he has three cars," including "a brand-new car" and "great credit." She also suspected defendant had a "stash of money somewhere." Additionally, she asserted he could work to assist her financially, despite his back injury, because he was "able to carry . . . groceries for his mother" and "sit at a computer all day long."

Regarding issues of custody and parenting time, plaintiff stated defendant had two-hour supervised visits on Tuesdays and Sundays, per court order, and the visits were "going okay." But given Ann's reports of her father "watching TV" during the visits or "putting her in front of the TV," plaintiff assumed Ann mostly "play[ed] with . . . her grandma" when she visited defendant.

The judge questioned plaintiff about her preferences for custody and parenting time going forward, stating, "[n]ormally, we would require you to

file . . . a Parenting Plan. . . . So, I'm asking you, . . . what do you propose in terms of a Parenting Plan, Custody Plan for [Ann]?" Plaintiff replied she did not want defendant to only see Ann "two hours two days a week," but believed he "need[ed] a psych[iatric] eval[uation]" before the court considered expanding his parenting time. She pointed to the possibility defendant would drive with Ann during visits, and rhetorically asked, "what medications is he even on . . . at this point?"

Plaintiff also testified she wanted defendant to take parenting courses and anger management classes so he would "have the tools to deal with" Ann. Additionally, plaintiff stated defendant should demonstrate why he would not be a danger to Ann, considering he suffered from "severe manic episodes" and paranoia during the marriage. Plaintiff feared Ann "might trigger" her father "during a manic episode" and he would "get physical," but conceded she knew of no instance when defendant "acted out toward" Ann during his visits.

The judge informed plaintiff he needed to consider certain statutory factors under N.J.S.A. 9:2-4[5] before finalizing the parties' custody and

---

[5] Pursuant to N.J.S.A. 9:2-4, a judge addressing custody and parenting time issues must consider the following fourteen factors:

parenting time arrangements. He highlighted numerous factors for the parties'

benefit. For example, he found the parties had a history of domestic violence,

reminding them he presided over their domestic violence trial. He also

> (1) the parents' ability to agree, communicate and cooperate in matters relating to the child;
> (2) the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse;
> (3) the interaction and relationship of the child with its parents and siblings;
> (4) the history of domestic violence, if any;
> (5) the safety of the child and the safety of either parent from physical abuse by the other parent;
> (6) the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision;
> (7) the needs of the child;
> (8) the stability of the home environment offered;
> (9) the quality and continuity of the child's education;
> (10) the fitness of the parents;
> (11) the geographical proximity of the parents' homes;
> (12) the extent and quality of the time spent with the child prior to or subsequent to the separation;
> (13) the parents' employment responsibilities; and
> (14) the age and number of the children.
>
> [N.J.S.A. 9:2-4(c).]

concluded Ann was too young for him to consider any preference she might express regarding custody and parenting time.

When the judge asked plaintiff about her willingness to communicate with defendant about their daughter, consistent with N.J.S.A. 9:2-4(c)(1), plaintiff stated she was amenable to such communication, via email, so long as the communications related directly to the child. Touching on other statutory factors referenced by the judge, plaintiff further testified she had no plans to relocate from her home, and no intention of removing Ann from her current school system. She also verified the parties lived near one another.

Turning to the issue of equitable distribution, plaintiff testified there were no "major assets" left to distribute, other than proceeds defendant might receive from pending lawsuits. She also stated the parties should satisfy their own credit card debt. But she asked the judge to order defendant to contribute to her counsel fees. She explained the divorce litigation had "just gone on for so long" that defendant "put [her] in debt," and she owed "[c]lose to $50,000" to her former attorneys. The judge told her, "[e]ventually, you're going to have to provide this court with those bills"; plaintiff noted this instruction, replying, "Okay."

Before defendant cross-examined plaintiff, the judge acknowledged she "filed a Case Information Statement [(CIS)] with the court already." Defendant responded, "[f]or the record, Your Honor, . . . [plaintiff] filed one CIS, one complete CIS, and that's the initial one." Defendant did not ask the judge then, nor during the balance of the trial, for an order compelling plaintiff to submit an updated CIS.

Several weeks later, when the virtual trial was due to continue, plaintiff asked for — and received — an adjournment because her daughter was at home with her. Before the judge postponed the proceeding, he conducted a phone conference with the parties. During the conference, defendant requested more time to prepare for trial, claiming he had not "done a CIS." But he also stated he "found a CIS from [his] previous attorney." The judge informed the parties he would reschedule the trial to a date "no sooner than a month from now," and directed defendant to promptly submit "whatever evidence" he wanted the court to consider once the trial resumed.

The trial continued three months later. When defendant took the stand, the judge asked him questions much like those he posed to plaintiff. Regarding his employment and housing situation, defendant stated he was unemployed and living with his mother, roughly half a mile away from

A-3545-20

plaintiff's residence. He testified he paid his mother rent of $150 per week. Additionally, defendant stated he "didn't make a bedroom yet" for Ann but if he had her for overnights, he would "make a bedroom for her."

Regarding his income, defendant testified he received $855 in weekly worker's compensation benefits, and Social Security payments totaling $2,607 per month. He noted $674 of his monthly Social Security benefits were paid to Ann as a derivative benefit.

Defendant also testified he received a lump sum of $89,282.60 from the SSA for back wages, but he spent virtually all those funds. In explaining how he spent this money, defendant estimated he paid between $10,000 and 15,000 to buy a certain toy collection and used another $20,000 to satisfy attorneys' fees and other litigation costs. Further, he bought over $6,000 worth of eBay purchases and paid almost $3,000 for lodging in Atlantic City. Additionally, he satisfied roughly $5,500 in credit card debt and $2,500 worth of loans, and gave his mother $20,958 for money he "owed her."

Defendant also testified he received a $320,000 settlement from his former employer for "lost wages" sometime in 2016 or 2017. The judge pointedly asked, "what happened to that money?" Defendant replied, "living − a lot [of] it was just towards living. I'm sure I gambled some of it. . . . I don't

have the day-to-day records of it." The judge remarked that defendant "created a lot of harm" and "squandered so much money that could have benefitted" Ann. Defendant replied, "Yeah, I know." He further conceded he engaged in "massive squandering . . . in a two-month period of time."

In addressing plaintiff's concerns about his physical and mental health, defendant stated he suffered from bipolar disorder and depression, and after his 2015 accident, he experienced "massive headaches." According to defendant, his neurologist recently told him he had "brain damage."[6] Additionally, defendant testified he was prescribed numerous medications for his ailments, including: Quetiapine for bipolar disorder; Topiramate and Aimovig for headaches; Wellbutrin for depression, Sertraline for post-traumatic stress disorder; Clonazepam to "help [him] think better;" and Trazadone to help him sleep. Defendant also stated he took Suboxone to wean himself off opioids before entering an inpatient program for his gambling addiction. And he attended weekly teletherapy with a psychologist.

---

[6] Defendant did not produce any expert witness at trial to establish the extent of his cognitive deficits. Moreover, the record reflects he readily answered questions posed to him by the judge and plaintiff during the trial, and he actively engaged in cross-examining plaintiff.

A-3545-20

The judge questioned defendant about his preference for a custody and parenting time arrangement in the future, much as the judge had when plaintiff testified. The judge stated, "[n]ormally, I would require the lawyers to present a custody and parenting plan. What is your plan? What do you think this court should do as it relates to custody and parenting?" Defendant proposed sharing physical custody of Ann, and though he acknowledged he regularly saw his daughter for supervised visits, he believed plaintiff was resistant to him having parenting time. He stated her concern about his physical and mental health, relative to his "ability to parent," was "unfounded." However, he subsequently testified plaintiff's concerns about his "temperament" and how "that temperament might carry . . . over onto" Ann was "reasonable."

After the judge explained he would consider various statutory factors under N.J.S.A. 9:2-4 to resolve the parties' custody and parenting time disputes, he offered to "lead [defendant] through the [fourteen statutory] factors," telling him he had "the right to add . . . anything." Defendant stated he was "okay with that."[7] The judge further suggested defendant "might want to use this list [of statutory factors to] . . . tailor [his] presentation."

---

[7] The judge also asked plaintiff if she was "okay with that" approach and she answered affirmatively.

In response to the judge's inquiries, defendant testified he "would be able to agree and communicate and cooperate [with plaintiff] in matters related to" Ann. Also, he denied the parties had a history of domestic violence, despite the entry of the FRO against him. Although defendant stated he acted in "self-defense" on the date of the January 2019 assault, the judge reminded defendant he was the judge who presided over the parties' domestic violence trial and he "didn't believe" defendant's position at that hearing.

When asked about Ann's safety and his ability to fulfill her needs, defendant testified Ann was "definitely" safe with him and he was one "hundred percent" sure he could satisfy her needs. Defendant also stated he intended to stay in his mother's home "[f]or the time being" and wanted Ann to remain in her current school. He also attested both parties were fit parents.

Before the trial concluded, plaintiff cross-examined defendant. Defendant represented he had not received a final workers' compensation award, and stated he understood the judge had ordered his attorneys to hold any workers' compensation award in trust pending further order. When the judge announced he also was going to order any proceeds from defendant's pending personal injury action to "be frozen . . . pending further order" so he could "decide how to apply that money, if [any]," defendant replied, "Yes, sir."

14

Shortly before the trial ended, plaintiff stated she owed "$40,000 [in] credit card debt and . . . $49,000 in lawyer fees." She added, "I think I sent you the bills today for lawyer fees." The judge assured both parties he would "look over all the evidence . . . presented . . . and . . . render a decision."

On June 24, 2021, the judge issued his opinion from the bench. Regarding custody and parenting time, the judge cited the statutory factors under N.J.S.A. 9:2-4(c) and found communication between the parties was "extremely difficult in view of the restraining order." He also concluded both parties were willing to accept custody of Ann and there was no "history of unwillingness to allow [parenting] time not based on substantiated abuse." The judge noted plaintiff was "sad that [Ann] . . . doesn't have a normal relationship with her father" but over time, he expected the father-daughter relationship would improve.

Next, the judge determined the interaction between Ann and plaintiff was "great," but defendant's relationship with Ann suffered due to defendant's preoccupation with pending lawsuits. The judge found the divorce action, in particular, "destroyed the[] parties financially" and "[t]here's nothing left [in the marital estate] except what may come from [other] lawsuits." Further, the

judge stated defendant's relationship with Ann would "take work to normalize [the] relationship."

Additionally, the judge stated he was "compelled to find . . . there was [a history of] domestic violence" between the parties, based on his finding in 2019 that defendant assaulted plaintiff. Although the judge declined to find Ann was "in danger of [being] physical[ly] abuse[d]" by defendant, the judge concluded "[i]f there were no restraining order, . . . [defendant] would continue to want to attack [plaintiff] and therefore [Ann] would be vicariously hurt. She would be collateral damage."

Next, the judge again found Ann was too young for him to consider any preference she might express regarding custody and parenting time. Further, he determined "[t]he needs of the child are being met by the mother," the parents' homes were stable and "within walking distance of each other," and there were no issues regarding the quality and continuity of Ann's education. He also deemed plaintiff fit to care for Ann, noting plaintiff was "healthy" and had "no psychiatric problems." However, the judge found defendant had "significant problems." The judge stated:

> [W]hen I first met him, he was out of control. He had this compulsion to gamble that he could not control . . . . He's dealing with whatever problems he

has but the court is concerned about how far he's gotten in that regard.

Turning to the quality of time defendant spent with Ann prior to the divorce, the judge found this factor was

> part of the genesis of this entire divorce. Defendant became consumed in his litigations, . . . and he kind of cut himself off from the world and his family. . . . My hope is that now that this is over maybe that will abate and he's going to realize what his priorities are.

Considering these and other factors, the judge concluded

> it is in the best interest of [Ann] that the mother be granted sole custody[8] of [the child]. She will be designated as parent of primary residence [PPR] and the defendant shall be designated parent of alternate residence [PAR].[9] [I] continue the parenting time as it

---

[8] A discrepancy exists between the judge's oral opinion and the amended JOD regarding the parties' legal custody arrangement. On June 24, the judge orally granted plaintiff "sole custody." But in his amended JOD, the judge directed, "[t]he parties shall share joint legal custody." Because: plaintiff does not appeal from the amended JOD awarding the parties joint legal custody; she testified she was willing to communicate with defendant via email about issues related to Ann; and the judge found "the parties could communicate" about Ann, we decline to disturb the joint legal custodial arrangement reflected in the amended JOD.

[9] "A Parent of Primary Residence (PPR) is a parent who provides a residence for the child for more than 50% of overnights annually. . . . A Parent of Alternate Residence (PAR) is a parent who provides an overnight residence for the child when he or she is not with the PPR." Child Support Guidelines (Guidelines), Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6A at ¶14(b)(1), www.gannlaw.com (2022).

currently is.  As a condition of expanding that, the defendant must undergo a parenting skills course.

Also, . . . since I did not get adequate information regarding [defendant's] current medical condition and psychiatric condition, I'm ordering a risk assessment.

The judge further ordered "[t]he parents shall consider an expansion of [defendant's] parenting time following the defendant[] successfully completing a parenting skills class."  Additionally, he modified the existing FRO to allow

Importantly, the Guidelines provide, in part, that a PAR must establish he or she

has or is expected to have the child for the substantial equivalent of two or more overnights per week over a year or more . . . and . . . show . . . separate living accommodations for the child are provided during such times (i.e., evidence of separate living accommodations maintained specifically for the child during overnight stays).

[Id. at ¶14(c)(2).]

Because defendant has no overnight visits under the amended JOD, plaintiff is Ann's "Custodial Parent," not her PPR, and defendant is Ann's "Non-Custodial Parent," rather than her PAR.  See id. at Appendix IX-B.  The June 28 amended JOD should be modified accordingly on remand.

the parties to communicate through Our Family Wizard[10].

Regarding child support, the judge found defendant received $1,355 per week in Social Security and workers' compensation benefits. Further, he credited defendant for the $156 per week Ann received in derivative benefits, and found defendant enjoyed "seventy-nine percent" of the parties' net weekly income. In arriving at this allocation, the judge imputed income to plaintiff at the rate of $408 per week, consistent with her prior earnings.

Finding defendant would continue to have "zero overnights" with Ann during supervised weekly visits at his mother's home, the judge completed a Sole-Parenting Worksheet and concluded defendant owed $98 per week under the Guidelines.[11] The judge explained this amount could change once defendant's workers' compensation benefits ended.

Before rendering a decision on plaintiff's request to have defendant pay her outstanding counsel fees, the judge stated he had not "added up" the invoices plaintiff submitted to the court. He stated he did not "have a list of

---

[10] Our Family Wizard is an online tool designed to facilitate communications between divorced or separated parents.

[11] A Sole-Parenting Worksheet is used to calculate child support when the non-custodial parent has less than "the substantial equivalent of two or more overnights per week." See Pressler & Verniero, Appendix IX-B to R. 5:6A.

19

[plaintiff's] exhibits" and inquired whether she "mark[ed] any exhibits into evidence." Plaintiff responded she had to "resend" the counsel fee invoices because "[the court clerk] couldn't upload . . . [her] PDF." With that, the judge marked the invoices from plaintiff's former attorneys as "P-1," and calculated from the bench how much they totaled. He determined plaintiff owed her attorneys $58,646.20.

In assessing whether defendant should contribute to these fees, the judge found defendant engaged in "antics" during the marriage, noting "a lot of money came into [his] hands . . . and instead of paying marital [bills,] he squandered it. In fact, he just gave his mother another $20,000 plus." The judge also stated he found defendant "in contempt of court" "several times."

Due to defendant's misconduct in court, his dissipation of a sizeable amount of funds during the marriage, and the judge finding plaintiff was unable to pay the counsel fees she incurred, the judge concluded defendant should be responsible for plaintiff's outstanding counsel fees. Although he found defendant did not "currently have the ability to pay" the $58,646.20 plaintiff owed, the judge projected defendant "may in the future" have that ability. Accordingly, the judge imposed "a lien against any proceeds which

defendant may receive from pending lawsuits," including his workers' compensation litigation.

Lastly, the judge deemed any remaining claims of the parties to be "waived" "or barred." He entered a conforming JOD that day. An amended JOD was executed four days later, with a Sole-Parenting Worksheet attached to reflect the child support award.

## II.

On appeal, defendant raises the following arguments:

POINT I

THE MATTER GENERALLY MUST BE REMANDED AS THE COURT FAILED TO CONSIDER AND/OR FAILED TO REQUIRE THE FILING BY THE PARTIES OF CERTAIN DOCUMENTS MANDATED BY THE NEW JERSEY RULES OF COURT. (NOT RAISED BELOW).

A.   CUSTODY AND PARENTING TIME PLAN

B.   CASE INFORMATION STATEMENTS

POINT II

THE TRIAL COURT'S RULING AS TO PARENTING TIME FOR THE DEFENDANT WAS AN ABUSE OF DISCRETION.
POINT III

THE TRIAL COURT IMPROPERLY ABUSED ITS DISCRETION IN AWARDING THE PLAINTIFF

21

CHILD SUPPORT IN THE SUM OF $98.00 PER WEEK.

POINT IV

THE AWARD OF COUNSEL FEES TO THE PLAINTIFF IN THE AMOUNT OF $58,646.20 WAS BOTH AN ABUSE OF DISCRETION AND NOT SUPPORTED BY THE FACTS IN THE RECORD.

Defendant's Point I, II, and III arguments are unavailing. But because the judge provided insufficient factual findings to support the counsel fee award referenced in Point IV, leaving us unable to determine its reasonableness, we are constrained to vacate the award and remand for further proceedings to allow the judge to supplement his findings. We add the following comments.

Our review of a judge's factual findings in a Family Part matter is limited. N.J. Div. of Youth and Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 476 (App. Div. 2012). The judge's factual findings are "binding on appeal when supported by adequate, substantial, credible evidence." Ibid. (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Cesare, 154 N.J. at 413. "Deference is especially appropriate 'when the evidence is largely testimonial

22

and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). This is so because the judge has the opportunity to see and hear the witnesses as they testify, thereby developing a "'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 396 (2009) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (internal quotations and citations omitted)). However, questions of law determined by the trial court require our de novo review. Avelino-Catabran v. Catabran, 445 N.J. Super. 574, 587 (App. Div. 2016).

A decision concerning custody or parenting time rests within the judge's sound discretion. See Abouzahr v. Matera-Abouzahr, 361 N.J. Super. 135, 157 (App. Div. 2003). In any custody or parenting time dispute, "it is well settled . . . the court's primary consideration is the best interests of the child[]." Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007) (citing Kinsella v. Kinsella, 150 N.J. 276, 317 (1997)). To resolve a contested custody and parenting time matter, a Family Part judge must consider the statutory factors under N.J.S.A. 9:2-4. Kinsella, 150 N.J. at 317.

It also is well established a Family Part judge "has substantial discretion in making a child support award. If consistent with the law, such an award

23

will not be disturbed unless it is manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice." Jacoby v. Jacoby, 427 N.J. Super. 109, 116 (App. Div. 2012) (quoting Foust v. Glaser, 340 N.J. Super. 312, 315-16 (App. Div. 2001) (internal quotations omitted)). A judge must consider the statutory factors under N.J.S.A. 2A:34-23 in determining the amount of child support to be paid by the supporting parent.[12] Additionally, where a judge finds a parent is underemployed or

---

[12] The statutory factors a judge must consider under N.J.S.A. 2A:34-23(a) include:

> (1)  Needs of the child;
> (2)  Standard of living and economic circumstances of each parent;
> (3)  All sources of income and assets of each parent;
> (4)  Earning ability of each parent, including educational background, training, employment skills, work experience, custodial responsibility for children including the cost of providing child care and the length of time and cost of each parent to obtain training or experience for appropriate employment;
> (5)  Need and capacity of the child for education, including higher education;
> (6)  Age and health of the child and each parent;
> (7) Income, assets and earning ability of the child;
> (8)  Responsibility of the parents for the court-ordered support of others;
> (9)  Reasonable debts and liabilities of each child and parent; and
> (10)  Any other factors the court may deem relevant.

unemployed, the judge may impute income to that party for the purpose of determining child support. Elrom v. Elrom, 439 N.J. Super. 424, 435 (App. Div. 2015) (citing Caplan v. Caplan, 182 N.J. 250, 268-70 (2005)).[13] Also, pertinent to this appeal, and consistent with our holding in Golian v. Golian, 344 N.J. Super. 337, 342-43 (App. Div. 2001), an "SSA adjudication of disability constitutes a prima facie showing that [a party] is disabled, and therefore unable to be gainfully employed, and the burden shifts to [the adversary] to refute that presumption."

We also recognize an award of counsel fees is subject to appellate review under an abuse-of-discretion standard. Barr v. Barr, 418 N.J. Super. 18, 46 (App. Div. 2011). A trial court's decision to grant or deny attorney's fees in a family action will be disturbed "only on the 'rarest occasion,' and then only because of clear abuse of discretion." Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). That abuse occurs when the family court's "decision is 'made without a rational explanation, [and] inexplicably depart[s] from established policies,

---

[13] This authority also is set forth in the Guidelines. See Pressler & Verniero, cmt. 12 on Appendix IX-A to R. 5:6A.

or rest[s] on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (citation omitted).

Governed by these principles, we discern no reason to second-guess the judge's findings relative to custody, parenting time or child support. Indeed, the record reflects the judge considered the necessary statutory factors under N.J.S.A. 9:2-4 when addressing custody and parenting time issues. For example, he noted defendant was "on a significant cocktail of various medications" and had "significant problems that cause[d] th[e] court concern," whereas plaintiff was healthy and had "no psychiatric problems." He also noted the parties had stable living situations and would be able to communicate regarding their daughter. But because the judge "did not get adequate information regarding [defendant's] current medical . . . and psychiatric condition[s]," he ordered defendant to undergo a "risk assessment" and placed "the onus . . . on [defendant] to expand his parenting time" by having him provide "competent evidence" he did "not present a risk" to Ann. Considering defendant's testimony about his physical and mental health, including his statement he suffered from "brain damage," the number of medications he was prescribed for his ailments, and his admission of plaintiff's concerns about the effect of his "temperament" on Ann was "reasonable," we

26

have no reason to second-guess the judge's determinations about custody and parenting time.

Likewise, we cannot conclude the judge abused his discretion in fixing child support. Here, he made findings about the child's needs, the parties' educational and employment history, and their financial circumstances, consistent with N.J.S.A. 2A:34-23(a), and he established a child support award pursuant to the Guidelines. In doing so, he properly considered plaintiff's unrefuted testimony she could again earn $17.50 per hour as a nursing assistant, and he recognized defendant could not work due to his disability. Further, the judge correctly noted the child support award might be modified once defendant's workers' compensation benefits ended. The judge's factual findings are well supported on this record.

Regarding defendant's novel argument that we must remand this matter based on the judge's failure to require the parties to file Custody and Parenting Time/Visitation Plans (CPVPs) and CISs, we disagree. Preliminarily we note we are not obliged to consider an issue not raised at the trial level. See State v. Galicia, 210 N.J. 364, 383 (2012); see also State v. Robinson, 200 N.J. 1, 19 (2009) ("Appellate review is not limitless. The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the

record before the trial court by the parties themselves."). To the extent we review arguments raised for the first time on appeal, we consider them under a plain error standard, meaning we disregard such errors unless they were "clearly capable of producing an unjust result." R. 2:10-2.

Here, we discern no such plain error. In reaching this conclusion, we reiterate that on the first day of trial, the judge told plaintiff during her direct examination, "[n]ormally, [the court] would require you to file what we call a Parenting Plan." He then asked her what she would "propose in terms of a Parenting [and] Custody Plan for [Ann]?" Plaintiff confirmed she opposed expanding the existing parenting time arrangements "unless [defendant] . . . identified what his problem[s were]," what "he's being treated for," and "what medications he's on." In that vein, she asked that he undergo "a psych[iatric] eval[uation]."

When the trial resumed some four months later, the judge similarly informed defendant, "[n]ormally, . . . lawyers [are required] to present a custody and parenting plan" when those issues are in dispute, before the judge asked defendant, "What is your plan? What do you think this court should do as it relates to custody and parenting?" Accordingly, by the time defendant testified, both parties had been informed of the need to file a CPVP, consistent

28

with Rule 5:8-5,[14] yet defendant never moved to compel plaintiff to file a CPVP — and he failed to file his own CPVP — despite having months to do so after plaintiff testified. He offers no reason for this oversight.

---

[14] Rule 5:8-5(a) provides:

> In any family action in which the parties cannot agree to a custody or parenting time/visitation arrangement, the parties must each file a [CPVP]. . . . [T]he [CPVP] shall include but shall not be limited to the following factors:
>
> > (1) Address of the parties;
> > (2) Employment of the parties;
> > (3) Type of custody requested with the reasons for selecting the type of custody:
> > > (a) Joint legal custody with one parent having primary residential care;
> > > (b) Joint physical custody;
> > > (c) Sole custody to one parent, parenting time/visitation to the other;
> > > (d) Other custodial arrangement;
> > (4) Specific schedule as to parenting time/visitation including, but not limited to, weeknights, weekends, vacations, legal holidays, religious holidays, school vacations, birthdays and special occasions (family outings, extracurricular activities and religious services);
> > (5) Access to medical school records;
> > (6) Impact if there is to be a contemplated change of residence by a parent;
> > (7) Participation in making decisions regarding the child(ren);
> > (8) Any other pertinent information;

29

More importantly, defendant fails to explain how he was prejudiced by the lack of a CPVP from plaintiff, considering the judge elicited testimony from her on topics which otherwise would have been addressed in a CPVP, such as her employment status, her living situation, and what type of custody and parenting time arrangements she preferred and why. Accordingly, any error on the part of the judge to sua sponte enforce Rule 5:8-5 was harmless.

We also are not convinced the judge committed plain error in failing to order the parties to update their CISs prior to trial. Per Rule 5:5-2(a), a CIS "shall be filed and served in all contested family actions . . . in which there is any issue as to custody, support, alimony or equitable distribution." Additionally, under Rule 5:5-2(c), "[p]arties are under a continuing duty . . . to inform the court of any material changes in the information supplied on the [CIS]." "All amendments to the statement shall be filed . . . no later than [twenty] days before the final hearing." Ibid.

Here, during plaintiff's cross-examination, the judge stated plaintiff "previously filed her [CIS]," and he assumed defendant "did the same through [his] attorney because there were prior motions for support . . . that would have necessarily . . . required both sides to file such CISs." Plaintiff agreed this was the case; also, defendant not only stated plaintiff had filed an "initial CIS," but

30

said he'd retrieved his own "CISs" from his former attorney's "case file."[15]

Thus, because: defendant did not dispute plaintiff filed a CIS during the dissolution action; the judge elicited testimony from both parties about their financial circumstances; and the record is devoid of any indication defendant moved before or during the trial to have plaintiff update her CIS, we discern no plain error in the judge's failure to order the parties to amend their CISs.

Finally, we address defendant's counsel fee argument under Point IV. As a threshold matter, we observe an allowance of counsel fees is permitted to any party in a divorce action, Rule 5:3-5(c), subject to the provisions of Rule 4:42-9. See J.E.V. v. K.V., 426 N.J. Super. 475, 493 (App. Div. 2012).

Under Rule 5:3-5, a judge must consider the following factors:

> (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

---

[15] The record reflects the parties did not seek to introduce their CISs at trial.

[R. 5:3-5(c).]

Significantly, "[i]n fashioning an attorney fee award, the judge must determine the 'lodestar,' which equals the number of hours reasonably expended multiplied by a reasonable hourly rate." J.E.V., 426 N.J. Super. at 493 (citations omitted); see also Rendine, 141 N.J. at 334-35. The "lodestar" principle is used to determine the amount of the fee award, not whether to award counsel fees.

An award of counsel fees may be appropriate when one party acts in bad faith, regardless of the parties' economic circumstances. See Yueh v. Yueh, 329 N.J. Super. 447, 461 (App. Div. 2000) (quoting Kelly v. Kelly, 262 N.J. Super. 303, 307 (Ch. Div. 1992)) ("'[W]here one party acts in bad faith, the relative economic position of the parties has little relevance' because the purpose of the award is to protect the innocent party from unnecessary costs and to punish the guilty party.")

Here, the judge found plaintiff was unable to pay her outstanding counsel fees totaling $58,646.20. He also concluded defendant acted in bad faith, having squandered money throughout the marriage, and been found in contempt during the divorce litigation. Additionally, the judge found defendant might have the ability going forward to satisfy plaintiff's counsel

32

fees if he received proceeds from his pending worker's compensation and personal injury cases. But the judge made no findings regarding the lodestar. As we have noted, "[t]he amount of attorney fees usually rests within the discretion of the trial judge, but the reasons for the exercising of that discretion should be clearly stated," Khoudary v. Salem Cnty. Bd. of Soc. Servs., 281 N.J. Super. 571 (App. Div. 1995) (citations omitted), and "the court must . . . make specific findings regarding the reasonableness of the legal services performed," F.S. v. L.D., 362 N.J. Super. 161, 170 (App. Div. 2003). "Without such findings it is impossible for an appellate court to perform its function of deciding whether the [judge's] determination below is supported by substantial credible proof on the whole record." Monte v. Monte, 212 N.J. Super. 557, 565 (App. Div. 1986) (citations omitted).

We also are concerned that it was not until the judge was rendering his oral opinion on the issue of counsel fees that he asked plaintiff if she "mark[ed] any exhibits into evidence." Plaintiff responded there was an inability on the part of the judge's clerk to "upload" the outstanding attorney invoices she had submitted to the court, so the judge took it upon himself to mark her attorney invoices as "P-1." Thus, we are not confident defendant had sufficient opportunity to review and contest the reasonableness of the invoices.

For these reasons, we are compelled to vacate the counsel fee award and remand for a new determination of plaintiff's fee application. On remand, notwithstanding that plaintiff is no longer represented by counsel, it remains her burden to demonstrate her entitlement to counsel fees consistent with the Rules of Court and the case law we have cited.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION